# FELIX v. PATRICK.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEBRASKA.

No. 301. Argued April 14, 1892. — Decided May 16, 1892.

F., a half-breed of the Sioux nation, received in 1857 a certificate of land-scrip under the treaty of July 15, 1830, 7 Stat. 328, and under the act of July 17, 1854, 10 Stat. 304, c. 83, which enacted that "no transfer or conveyance of any of said certificates or scrip shall be valid." In March, 1860, she executed a power of attorney in blank, and a quitclaim deed in blank, the name of the attorney, the description of the land, and the name of the grantee in the deed being omitted. These came into the possession of P., on the payment of $150, who inserted the name of R. as attorney, and his own name as grantee, and a tract of 120 acres in Omaha, of which he was already in possession, but without valid title, as the description. The deed was then delivered to him by R. and was put upon record. P. never informed F. of this location, or of the record of these several instruments, but remained in possession of the located tract, either personally or through his grantees. Congress, on the procurement of P., confirmed his title to the tract. 15 Stat. 186, c. 240; 269, c. 21. The half-breed was ignorant of all this until August, 1887, when the Sioux Indians became citizens of the United States by virtue of article 6 of the treaty of April 29, 1868, 15 Stat. 637. In 1888 the representatives of F., who had deceased, filed a bill in equity against P., setting forth these facts: averring that the power of attorney and quitclaim deed had been fraudulently procured by some persons unknown, and praying that P. should be decreed to have taken the title in trust for F., and that the power of attorney and the quitclaim deed should be declared to be fraudulent and a cloud upon plaintiffs' title, and that the defendants be directed to surrender the estate to plaintiffs. To this the defendants demurred, and the court below dismissed the bill. *Held,*

(1) That P. was chargeable with notice that the power and the quitclaim deed were intended as devices to evade the law against the assignment of the scrip, and that he acquired no title through them;

(2) That he acquired no additional rights through the confirmatory acts of Congress;

(3) That having no right to locate the scrip for his own benefit, he must be deemed to have located it for F. and as her representative;

(4) That this implied trust did not prevent him from taking and holding possession of the land adversely to her and for his own use and benefit;

(5) That, under these circumstances, F. was bound to use reasonable diligence in discovering the fraud, and seeking redress;

(6) That, conceding that plaintiffs were incapable of being affected with laches so long as they maintained their tribal relations, the bill was fatally defective in not setting forth when and how the alleged frauds were discovered, in order that the court might clearly see whether it could not have been discovered before;

(7) That, in view of all the circumstances it would be inequitable to disturb the disposition made of the case below;

(8) That the most which could be justly demanded would be the repayment of the $150, with interest.

THIS was an appeal from a decree sustaining demurrers to a bill in equity filed by the heirs of Sophia Felix against the defendant Patrick and his grantees, for the purpose of having them declared trustees for the plaintiffs of certain lands in the city of Omaha, which, in 1861, he had caused to be entered in the name of Sophia Felix by virtue of certain scrip issued to her as a member of the Dakota or Sioux nation of Indians.

The allegations of the bill were, in substance, as follows :

1. That in 1854, Sophia Felix, being a half-breed of the Sioux or Dakota nation of Indians, residing in Minnesota, was under the treaty of July 15, 1830, and the act of Congress of July 17, 1854, entitled to have issued to her scrip for the location of 480 acres of land, as provided by that act. That in 1857 scrip was issued to her for 480 acres, and that before the location of said scrip the said Sophia Felix intermarried with one David Garnelle.

2. That on March 31, 1860, certain persons unknown, " by certain wicked devices and fraudulent means," procured the said Sophia with her husband, said David Garnelle, to execute a power of attorney in blank, also a quitclaim deed in blank, a copy of each of which was attached to the bill. The power of attorney omitted the name of the attorney, the number of the scrip and the description of the land, and authorized the person whose name was to be inserted to sell, and convey, and confirm unto the purchaser thereof the following described pieces or parcels of land, " to be located for us, and in our name," etc. The quitclaim deed also omitted the name of the grantee and the description of the land ; but both instruments were otherwise in legal form.

3. That the defendant Patrick in November, 1861, pro-

cured from some person unknown possession of said scrip, to the amount of 120 acres, and on November 21 made application to the land office at Omaha to locate such scrip, and thereupon, in the name of said Sophia Felix, located the same upon certain described real estate in the county of Douglas and Territory of Nebraska. (These lands are now admitted to be within the limits of the city of Omaha.) That "at the time of said location, the said Sophia Felix had never parted with the title to or any interest in said scrip, and was the absolute owner thereof and sole beneficiary therein, and these facts the said Matthewson T. Patrick at that time and at all times well knew, and the said location enured wholly to the benefit of the said Sophia Felix," although she had no knowledge that Patrick had procured the possession of the said scrip or located the same. That the said Patrick "in securing possession of said scrip procured the same with the intent to appropriate the scrip to his own use and defraud the said Sophia Felix out of the same, and out of all interest therein, and out of all benefits thereunder, and located the same, designing it for his own use and benefit, and with the fraudulent intent to deprive the said Sophia Felix out of all benefit and interest therein."

4. That in the further prosecution of his scheme to defraud, Patrick secured the blank power of attorney and quitclaim deed, and shortly thereafter caused the power to be filled out with a description of the scrip, and of the property located with it, and caused the name of William Ruth to be inserted as the attorney to sell and convey the property, a description of which was so inserted; that he also caused the quitclaim deed to be filled out with a description of the property, and inserted his own name as grantee, making the instrument purport to be a conveyance by Sophia and David Garnelle to himself; that on September 7, 1863, he caused the said power of attorney and quitclaim deed to be filed for record in the recorder's office of Douglas County; and in furtherance of said wrongful designs caused the said William Ruth, named by himself as attorney, to execute and deliver to him a deed of the property, by virtue of his pretended authority, and caused the same to be filed for record.

5. That at and before the location of such scrip, defendant Patrick was in possession of the premises, and had attempted to acquire title to the same by preëmption, but in that respect was unsuccessful, and that said scrip was procured and located by him for his own benefit, and to acquire a title which he could not acquire under the preëmption acts.

6. That in furtherance of said scheme, the said Patrick procured the enactment of an act of Congress, approved February 2, 1869, confirming the title to the land in question to the parties holding by deed from the patentee.

7. That the said Patrick never informed the said Sophia or her husband, or any one related to her by blood, "that he had procured and located said scrip, or that he had procured said blank instruments and filled them out, or had caused a deed to be executed conveying to himself the real estate hereinbefore described, or that he claimed any ownership therein; but, on the contrary, fraudulently concealed the same and exercised every precaution to prevent said proceedings coming to the knowledge of said parties;" that, recognizing the frailty of his title, he endeavored for several years to secure the execution of a deed by the said Sophia and her husband without letting them know the character of the instrument whereby they would convey to him in fee the said property, and to that end procured his father to write a letter, a copy of which was made an exhibit; that all the acts heretofore stated were in the execution of an unlawful scheme to wrong and defraud said Sophia out of said scrip and property; that the instruments executed as aforesaid by her and her husband were not intended by them to be used for the purpose of conveying the said property to any person whatsoever, or to authorize such conveyance by any other person, and no consideration was received by either of them for the scrip; but that Patrick has claimed and still claims and asserts ownership in the premises ever since the location of said scrip.

8. That a large part of said land has been platted and recorded, divided into lots, and sold by warranty deed to others, who are made defendants as purchasers from him of particular descriptions given in the bill.

9. That these grantees had notice of infirmities, if not actual fraud, attaching to the title of Patrick, since among other things the power of attorney and deed are dated nearly two years prior to the scrip location; that on July 3, 1863, the United States issued to the said Sophia Felix its patent for the premises, which was filed for record on July 25, 1863.

10. That the said Sophia Garnelle died December, 1865, and during her lifetime had no knowledge that Patrick had secured and located said scrip; had no knowledge that the power of attorney and quitclaim deed had been filled out or used in any manner, or placed on record; and had no knowledge as to the disposition made of such scrip, or of the acts of the said Patrick; that the plaintiffs, who are the heirs at law of the said Sophia Felix, had no knowledge whatever of the facts set forth until 1887, when, under a certain treaty with the Sioux Indians, they became citizens of the United States; and that prior to this time they had maintained their tribal relations with the Sioux Indians, and were, by acts of Congress, inhibited and barred from instituting any action in any of the courts, Federal or state, in the United States, were denied access to the said courts, and had no legal standing therein as a party.

11. That Patrick and those claiming under him ought not to be permitted to hold such real estate, but should surrender the same to the plaintiffs, in view of the fact that said scrip, under the treaty of Prairie du Chien, and the act of Congress of July 17, 1854, could not be sold, assigned or transferred directly or indirectly; that Patrick received said scrip in trust for said Sophia, and located the same in trust for her, and holds possession of the land as trustee for her and her heirs, and ought not to be allowed to assume any adverse relation to the plaintiffs; that he ought also to account for the rents, issues and profits of said land for all the time he has had possession thereof, etc.; prayer, that he be declared a trustee; that the power of attorney and quitclaim deed be declared fraudulent and void, and a cloud upon plaintiffs' title, and be cancelled; that the act of Congress confirming Patrick's title to the lands be declared unconstitutional and void; that the defendants

surrender possession of the land to the plaintiffs; and that the said Patrick account for the rents and profits, etc.

There were three separate demurrers filed to this bill by Patrick and several of the other defendants, principally upon the ground of want of equity and laches. Upon hearing in the court below the bill was dismissed, (36 Fed. Rep. 457,) and the plaintiffs appealed to this court.

*Mr. William D. Shipman* for appellants, on the question of laches said:

The appellees confront us with the claim that, granting the void character of the pretended deeds to Patrick, and the power of attorney in which he inserted the name of Ruth, and the description of the land, still the appellants are entitled to no relief because they delayed their suit for that relief too long. To this defence we answer: (1) This suit was commenced as soon as the fraud practised on these appellants, by the disposition attempted to be made of their property, was discovered by them, and that if the appellants had been white persons, their relief would not be barred on account of lapse of time; (2) That the appellants were, from their birth, down to the 29th of August, 1887, tribal Indians, under such conditions of wardship, pupilage, constraint, dependence and disabilities, that no statute of limitations, or lapse of time, could run against them or bar their right to relief, while those conditions remained.

I. The bill alleges that suit was brought as soon as the fraud was discovered. But the appellees, under the second head of demurrer, claim that the appellants did not use due or reasonable diligence in discovering the fraud. That this defence is without merit or validity will appear by recurring to the statute under which this scrip was issued. 10 Stat. 304, c. 83.

In a transaction like this, if the victims of the fraud had been white persons, especially if they were ignorant, feebleminded and living far from the place where the land was situated and the fraudulent scheme enacted, they would not be barred of relief by the time which elapsed in this case before suit was brought. *Michoud* v. *Girod*, 4 How. 503.

In *Allore* v. *Jewell*, 94 U. S. 506, this court refused to apply a bar of the statute or the doctrine of laches where all the facts were known to the complainant more than six years before he commenced his suit. See also *Griswold* v. *Hazard*, 141 U. S. 260, 288; *Bryan* v. *Kales*, 134 U. S. 126, 135; *Trevelyan* v. *Charter*, 11 Cl. & Fin. 714; *Maloney* v. *L'Estrange*, Beatty, 406; *Carpenter* v. *Canal Co.*, 35 Ohio St. 307; *Oliver* v. *Piatt*, 3 How. 333, 411; *Reynolds* v. *Sumner*, 126 Illinois, 58.

In *Prevost* v. *Gratz*, 6 Wheat. 481, Mr. Justice Story, in delivering the opinion of this court, said: "It is certainly true that length of time is no bar to a trust clearly established; and in a case where fraud is imputed and proved, length of time ought not, upon principles of eternal justice, to be admitted to repel relief. On the contrary, it would seem that the length of time during which the fraud has been successfully concealed and practised, is rather an aggravation of the offence, and calls more loudly upon a court of equity to grant ample and decisive relief."

II. I now proceed to consider the condition of the appellants as tribal Indians. This aspect of the case involves grave considerations, which go to the root of the public policy of the United States in its treatment of the aboriginal inhabitants of this continent. This tribunal has, for more than sixty years, dealt with and often defeated the wrongs attempted against the red man. The condition of the latter appeals now with greater pathos, and with a clearer warrant of justice, for protection against the acts, and especially against the frauds of one of the white race. It is true they retain but a remnant of their former number and greatness; but they are still sufficiently numerous and formidable to call for constant oversight, care and protection by the Federal government. Their care and control absorb the time and attention of a large part of the military force of the nation, and their civil affairs require the constant and exclusive oversight of one of the most important administrative bureaus.

The utterances of the courts, both State and National, have so uniformly recognized the disabilities of these people, and

their exemption from the legal rules and responsibilities which govern and affect the dominant race, that they constitute one of the " Trade winds of the law." This court is too familiar with these utterances to require more than the few citations which follow: *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17; *Fellows* v. *Blacksmith*, 19 How. 366; *Kansas Indians*, 5 Wall. 737; *New York Indians*, 5 Wall. 761; *Ex parte Crow Dog*, 109 U. S. 556, 568; *Elk* v. *Wilkins*, 112 U. S. 94, 111; *United States* v. *Kagama*, 118 U. S. 375, 383; *Choctaw Nation* v. *United States*, 119 U. S. 1.

It should be borne in mind that neither Sophia Felix, nor these appellants, could, from the issuing of this scrip to her down to the year 1887, when this suit was brought, have instituted any suit in the courts of the United States for the purpose of having these fraudulent transactions of Patrick set aside, even had they known what he had done. They were neither aliens nor citizens of the United States and, therefore, did not come within the statutes conferring jurisdiction on the latter. *Karrahoo* v. *Adams*, 1 Dillon, 344; *McKay* v. *Campbell*, 2 Sawyer, 118, 135; *Elk* v. *Wilkins*, 112 U. S. 94, 109.

I do not overlook the statement in the opinion below in this case, that Indians sometimes apply to the state courts for redress of their wrongs. It is quite true that, in some peculiar cases, they have done so, when they were compelled to as the only mode left to them by which they could secure protection. As a rule they failed to secure their rights from the state tribunals and had to appeal to this court for redress.

In the face of the condition of these Indians, and the declarations of this court in regard to the subjection to, and dependence on, the government of the United States, and their exemption from the laws of the States, can the doctrine of laches, or that of adverse possession, or the statute of limitations, be held to bar their right to relief, because they did not do what was impossible, viz.: hunt out and discover this fraud, of which they were ignorant, and then bring a suit in the courts of the State of Nebraska?

*Mr. John L. Webster* for appellees.

*Mr. J. C. Cowin* (with whom was *Mr. J. H. Parsons* on the brief) closed for appellants.

MR. JUSTICE BROWN, after stating the case as above, delivered the opinion of the court.

There are really but two questions involved in this case: (1) whether Patrick located this scrip and took these lands under the blank power of attorney and deed, as trustee for Sophia Felix; and (2) whether the plaintiffs are estopped by their own laches and those of Sophia Felix from insisting that Patrick shall be decreed to hold the lands for their benefit.

The facts of the case, briefly stated, are as follows: Sophia Felix, a half-breed Indian, was entitled under an act of Congress of July 17, 1854, 10 Stat. 304, c. 83, to certain scrip which might be located upon any unoccupied land subject to preëmption or private sale, but it was expressly provided in the act that no transfer or conveyance of such scrip should be valid. In pursuance of this act, scrip was issued to her in 1857, to the amount of 480 acres. The scrip itself not being assignable, some person (who it was does not appear) obtained possession of such scrip to the amount of 120 acres from the said Sophia and her husband, (she having in the meantime married,) and also procured from them a power of attorney and quitclaim deed, bearing date March 31, 1860, and executed in blank. Nearly two years thereafter, and in November, 1861, these were turned over (by whom it does not appear) to Patrick, who located the scrip upon the lands in question, of which he had already been in possession for some time, and to which he had endeavored, though unsuccessfully, to acquire title by preëmption, caused the name of William Ruth to be inserted as attorney in the power, and his own name as grantee in the quitclaim deed, after filling in the description of this property; and on July 25, 1863, procured from Ruth under his power of attorney a warranty deed to himself of the same property. The description of

the land in the quitclaim deed seems to have been defective, and in the meantime, viz.: July 3, 1863, a patent had issued to Sophia Felix. Patrick has been in possession of these lands ever since. A large part of the tract has been platted and recorded as an addition to the city of Omaha, and is divided into blocks and lots, intersected by streets, and a large part of the lands have been sold to purchasers, whose only notice of the infirmity in their title appears to have been the fact that the power of attorney and quitclaim deed were dated nearly two years prior to the scrip location.

1. The device of a blank power of attorney and quitclaim deed was doubtless resorted to for the purpose of evading the provision of the act of Congress that no transfer or conveyance of the scrip issued under such act should be valid. This rendered it necessary that the scrip should be located in the name and for the benefit of the person to whom it was issued, but from the moment the scrip was located and the title in the land vested in Sophia Felix, it became subject to her disposition precisely as any other land would be. In order, therefore, for the purchaser of this scrip from Sophia Felix to make the same available, it became necessary to secure a power of attorney or a deed of the land, and as the scrip had not then been located, and the person who should locate it was unknown, the name of the grantee and the description of the land must necessarily be left blank. Had the notary, who took the acknowledgment, observed these blanks, he would doubtless have declined to act until they were filled out, particularly in view of the fact that the grantors were Indians, and the scheme a palpable device to evade the law against the assignment of the scrip. It is pertinent in this connection to note the fact that the secretary of State, whose certificate was made in June, 1861, certified merely to the official character of the notary, while the clerk of the District Court of the county, whose certificate was made August 20, 1863, after the scrip was located, and the blanks in the instrument filled out, certifies that the same were executed and acknowledged according to the laws of the State of Minnesota. As the bill alleges that Patrick

obtained possession of these instruments while still in blank, he is clearly chargeable with notice that they were intended as a device to evade the law against the assignment of scrip.

Having, then, no right to locate the scrip for his own benefit, he must be deemed to have located it for Sophia Felix, and as her representative. It was declared by this court as early as 1810, in the case of *Massie* v. *Watts*, 6 Cranch, 148, that if an agent located land for himself which he ought to locate for his principal, he is in equity a trustee for his principal. In that case the defendant Massie had ᴄ racted with one O'Neal to locate and survey for him a military warrant for 4000 acres in his name. Massie located the warrant with the proper surveyor, and, being himself a surveyor, fraudulently made a survey purporting to be a survey of the entry, but variant from the same, so that the land actually surveyed was not the land entered with the surveyor. This was done for the fraudulent purpose of giving way to a claim of the defendant's which he surveyed on the land entered for the plaintiff, whereby the plaintiff lost the land, and defendant obtained the legal title. This court held that Massie held such land as trustee for O'Neal. "But Massie," said Chief Justice Marshall, (p. 169,) "the agent of O'Neal, has entered and surveyed a portion of that land for himself, and obtained a patent for it in his own name: According to the clearest and best established principles of equity, the agent who so acts becomes a trustee for his principal. He cannot hold the land under an entry for himself otherwise than as trustee for his principal." This case was subsequently cited with approval in *Irvine* v. *Marshall*, 20 How. 558. So in *Brush* v. *Ware*, 15 Pet. 93, where an executor obtained a certificate for 4000 acres of land, and afterwards sold and assigned the same, when it appeared under the will that he had no right to sell the land, it was held that the purchaser to whom the patent was subsequently issued, took with notice of the prior title of the heirs, and was bound to make the conveyance asked from him. To the same effect are *Stark* v. *Starrs*, 6 Wall. 402, 419 ; *Meader* v. *Norton*, 11 Wall. 442, 458. And in *Widdicombe* v. *Childers*, 124

U. S. 400, 405, it was held that a person who had obtained a patent to lands which the patentee knew he had no right to claim, took the legal title subject to the superior equities of the rightful owner. In delivering the opinion, Chief Justice Waite said: "The holder of a legal title in bad faith must always yield to a superior equity. As against the United States his title may be good, but not as against one who had acquired a prior right from the United States in force when his purchase was made under which his patent issued. The patent vested him with the legal title, but it did not determine the equitable relations between him and third persons." See also *Morris* v. *Joseph*, 1 West Va. 256.

The substance of these authorities is that, whenever a person obtains the legal title to land by any artifice or concealment, or by making use of facilities intended for the benefit of another, a court of equity will impress upon the lands so held by him a trust in favor of the party who is justly entitled to them, and will order the trust executed by decreeing their conveyance to the party in whose favor the trust was created. It is of no consequence in this connection that Sophia Felix was ignorant of the defendant's acts, or of the trust thereby created, since she was at liberty, upon discovering it, to affirm the trust and enforce its execution. *Bank of Metropolis* v. *Guttschlick*, 14 Pet. 19, 31; *Moses* v. *Murgatroyd*, 1 Johns. Ch. 119; *Cumberland* v. *Codrington*, 3 Johns. Ch. 229, 261; *Neilson* v. *Blight*, 1 Johns. Cas. 205; *Weston* v. *Barker*, 12 Johns. 276.

It needs no argument to show that no additional right was acquired by Patrick under the acts of July 25, 1868, and February 2, 1869, confirming the title to the lands to the parties holding by deed from the patentee. Such act might estop the government itself from taking proceedings to cancel the patent already issued, or to oust Patrick, but to hold it operative as affecting the rights of third parties would be virtually recognizing judicial power in the legislature. In no possible view of legislative authority, can it be assumed that an act of Congress can declare that lands to which one party is by law entitled, shall belong to another.

In addition to this, however, Patrick was not a man "holding by deed from the patentee" within the meaning of the law. The power of attorney and quitclaim deed, being in blank when they passed from the possession of Sophia Felix, were inoperative to convey her title to any particular land. Nor, under the allegations of this bill, can it be claimed that she ever authorized these blanks to be filled, since it is averred that the instruments were procured fraudulently and without consideration, and neither the person to whom she delivered them, nor Patrick himself, could be considered her agent for filling out the blanks. Such agency, if it exists at all, must be exercised before the deed is delivered. In order to pass the legal title to lands something more is necessary than the signature of the grantor to a blank instrument. There must be an intent to convey, and the delivery of a deed for the purpose of vesting a present title in the grantee, and a deed delivered without the consent of the grantor is of no more effect to pass title than if it were a forgery. *Hibblewhite* v. *McMorine*, 6 M. & W. 200; *Davidson* v. *Cooper*, 11 M. & W. 778, 793; *Burns* v. *Lynde*, 6 Allen, 305; *Everts* v. *Agnes*, 4 Wisconsin, 343; *S. C.* 6 Wisconsin, 453; *Tisher* v. *Beckwith*, 30 Wisconsin, 55; *Hadlock* v. *Hadlock*, 22 Illinois, 384; *Stanley* v. *Valentine*, 79 Illinois, 544; *Henry* v. *Carson*, 96 Indiana, 412; *Fitzgerald* v. *Goff*, 99 Indiana, 28. At best, the deed, being a quitclaim, conveyed only the interest of the grantor at the date of its delivery, which was nothing. *Nichols* v. *Nichols*, 3 Chandler (Wis.) 189; *Lamb* v. *Davenport*, 1 Sawyer, 604, 638.

2. The most important question in this case, however, the question upon which its result must ultimately depend, is that of laches. While, upon the facts stated, Patrick took these lands as trustee for Sophia Felix, he did not take them under an express trust to hold them for her benefit, (in which case lapse of time would be immaterial,) but under an implied or constructive trust — a trust created by operation of law, and arising from the illegal practices resorted to in obtaining the power of attorney and deed. Patrick did not take possession under any acknowledged obligation to her, but he located

them for his own use and benefit; his possession from the very beginning was adverse to hers. Under such circumstances, the law raises an obligation upon the part of the *cestui que trust* to make use of reasonable diligence in discovering and unearthing the fraud, and in applying to the courts for legal redress. In this case 28 years elapsed from the time the scrip was procured of Sophia Felix, and nearly 27 years from the time it went into the possession of Patrick, before the bill was filed. It admits of no doubt that if Sophia Felix and these plaintiffs had been ordinary white citizens, under no legal disabilities, such as those arising from infancy, lunacy or coverture, this lapse of time would be fatal to a recovery; at least unless it were conclusively shown that knowledge of the fraud was not obtained, and could not by reasonable diligence have been discovered, within a reasonable time after it was perpetrated.

In reply to this defence of laches, plaintiffs rely mainly upon the fact that Sophia Felix and her heirs were at the time, and continued to be until 1887, tribal Indians, members of the Sioux nation, residing upon their reservation in the State of Minnesota, and incapable of suing in any of the courts of the United States. We are by no means insensible to the force of this suggestion. Whatever may have been the injustice visited upon this unfortunate race of people by their white neighbors, this court has repeatedly held them to be the wards of the nation, entitled to a special protection in its courts, and as persons "in a state of pupilage." Congress, too, has recognized their dependent condition, and their hopeless inability to withstand the wiles or cope with the power of the superior race, by imposing restrictions upon their power to alienate lands assigned to them in severalty, either by making their scrip non-assignable, as in this case, or by requiring the assent of the President to their execution of deeds as in the case of *Pickering* v. *Lomax, ante,* 310, decided at this term. We fully coincide with what was said by Mr. Justice Davis in the case of the *Kansas Indians,* 5 Wall. 737, 758, that "the conduct of Indians is not to be measured by the same standard which we apply to the conduct of other people." But their very anal-

ogy to persons under guardianship suggests a limitation to
their pupilage, since the utmost term of disability of an infant
is but 21 years, and it is very rare that the relations of guar-
dian and ward under any circumstances, even those of lunacy,
are maintained for a longer period than this.   It is practically
admitted in this case that, in 1887, when their relations with
their tribe were severed by accepting allotments of land in
severalty under the treaty of April 29, 1878, they became
citizens of the United States; that they were then chargeable
with the same diligence as white people in the discovery of
this fraud; and, as their bill was filed in 1888, it is claimed
that they fulfilled all the requirements of law in this particu-
lar.   While, as alleged in the bill, their discovery of this
fraud may have been contemporaneous with their becoming
citizens of the United States there is no palpable connection
between the one fact and the other, and we think the bill is
defective in failing to show how the fraud came to be dis-
covered, and why it was not discovered before.   A simple
letter to the Land Department at any time after this scrip
was located would have enabled them to identify the land,
and the name of the person who had located it; and it is diffi-
cult to see why, if they had ever suspected the misuse of this
scrip, they had not made inquiries long before they did, or
why their emancipation in 1887 should have suddenly awak-
ened their diligence in this particular.   There is, it is true, an
averment that Patrick never informed the said Sophia or her
husband that he had located such scrip, but, on the contrary,
fraudulently concealed the same, and exercised every precau-
tion to prevent such proceedings coming to the knowledge of
the party.   But no acts of his in this connection are averred
in the bill, and we are left to infer that his concealment was
that of mere silence, which is not enough.   *Wood* v. *Carpenter*,
101 U. S. 135, 143; *Boyd* v. *Boyd*, 27 Indiana, 429; *Wynne* v.
*Cornelison*, 52 Indiana, 312.   Indeed, his concealment is to a
certain extent negatived by the fact that he put the power of
attorney and deed upon record, in the proper county, shortly
after their execution.   It was held by this court in *Badger* v.
*Badger*, 2 Wall. 94, in speaking of the excuses for laches,

that "the party who makes such appeal should set forth in his bill, specifically, what were the impediments to the earlier prosecution of his claim; how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance; and how, and when, he first came to a knowledge of the matters alleged in his bill; otherwise the chancellor may justly refuse to consider his case, upon his own showing, without inquiring whether there is a demurrer or formal plea of the statute of limitations contained in the answer." Sophia Felix and her husband must have known that she had parted with the scrip, yet she lived until 1865, and her husband until 1882, without apparently making any attempt to discover what had become of it. Nor did their heirs apparently make any effort to discover it until 1887, when their intelligence seems to have suddenly sprung into activity upon their becoming citizens of the United States. It is scarcely necessary to say in this connection that, while until this time they were not citizens of the United States, capable of suing as such in the Federal courts, the courts of Nebraska were open to them as they are to all persons irrespective of race or color. *Swartzel* v. *Rogers*, 3 Kansas, 374; *Blue Jacket* v. *Johnson County*, 3 Kansas, 299; *Wiley* v. *Keokuk*, 6 Kansas, 94. It was said by this court in *Wood* v. *Carpenter*, 101 U. S. 135, 140, that in this class of cases the plaintiff is held to stringent rules of pleadings and evidence, and especially must there be distinct averments as to the time when the fraud, mistake, concealment or misrepresentation was discovered, and what the discovery was, so that the court may clearly see whether by ordinary diligence the discovery might not have been before made. See also *Stearns* v. *Page*, 7 How. 819, 829; *Wollensak* v. *Reiher*, 115 U. S. 96; *Godden* v. *Kimmell*, 99 U. S. 201, 211. The mere fact that in 1887 these plaintiffs took their lands in severalty and became citizens, does not adequately explain how they so quickly became cognizant of this fraud, or why they had remained so long in ignorance of it.

But, conceding that the plaintiffs were incapable, so long as they maintained their tribal relations, of being affected with

laches, and that these relations were not dissolved until 1887, when they were first apprised of their right to this land, it does not necessarily follow that they are entitled to the relief demanded by this bill. The real question is, whether equity demands that a party, who, 28 years ago, was unlawfully deprived of a certificate of muniment of title of the value of $150, shall now be put in the possession of property admitted to be worth over a million. The disproportion is so great that the conscience is startled, and the inquiry is at once suggested, whether it can be possible that the defendant has been guilty of fraud so gross as to involve consequences so disastrous. In a court of equity, at least, the punishment should not be disproportionate to the offence, and the very magnitude of the consequences in this case demands. of us that we should consider carefully the nature of the wrong done by the defendant in acquiring the title to these lands. He. is not charged in the bill with having been a party to the means employed in obtaining the scrip from Sophia Felix, or with being in collusion with the unknown person who procured it from her. More than that, the allegations of this bill do not satisfy us that she did not receive full value for the scrip. It is true, there are general averments that the power of attorney and quitclaim deed were obtained "by wicked devices and fraudulent means;" that she never parted with her title to or interest in the scrip, and was the absolute owner thereof; that the blank instruments were not intended to be used for the purpose of conveying this property; and that no consideration was ever received for the scrip. But in view of the fact that she and her husband are long since dead, and the party who procured it from her is unknown, it is very improbable that the plaintiffs could prove these facts, or the nature of the original transaction. It is evident that she intended to part with the scrip to some one, and the recital of a nominal consideration in a quitclaim deed is entitled to very little weight as evidence of the actual consideration.

However this may be, taking all the allegations of this bill together, it is very evident that Patrick bought these

muniments of title as hundreds of others bought them — in violation of the letter and policy of the law, but without actually intending to defraud Sophia Felix or any other person. The law pronounces the transaction a fraud upon her, but it lacks the element of wickedness necessary to constitute moral turpitude. If there had been a deliberate attempt on his part by knavish practices to beguile or wheedle her out of these lands, we should have been strongly inclined to afford the plaintiffs relief at any time during the life of either of the parties; but, as the case stands at present, justice requires only what the law, in the absence of the statutory limitation would demand — the repayment of the value of the scrip with legal interest thereon.

Much reliance is placed upon a certain letter written by the defendant's agent and father to one Otis, bearing date September 21, 1863, authorizing him to procure the signature of Sophia and her husband to certain papers, for which he was to pay $100, and it was intimated that this should be done without giving the parties any particular information. This letter is of little value, except as indicating that defendant desired to strengthen his title by purchasing whatever claim Sophia and her husband might have had to it, if it could be done at a slight expense. It is sufficient answer to it to say that nothing ever appears to have been done under it, or by virtue of it, and it affords too feeble an indication of previous fraud to be entitled to any weight in that connection.

There are other considerations which require to be noticed in this connection. By the foresight and sagacity of this defendant this scrip was located upon lands within the limits of one of the most thriving and rapidly growing cities of the West. That which was wild land thirty years ago is now intersected by streets, subdivided into blocks and lots, and largely occupied by persons who have bought upon the strength of Patrick's title, and have erected buildings of a permanent character upon their purchases. The bill charges all these with notice of the defect in Patrick's title, and prays that the conveyances to them be declared null and void, and

that plaintiffs be admitted into possession of their lands, and that Patrick account for rents, profits and issues, so far as he has received them. If the views put forward in their brief be correct, that these instruments were of no greater effect than if they had been forgeries, it is difficult to see how these transfers can be supported, and it needs no argument to show that the consequences of setting them aside would be disastrous. Certainly, if they were not entitled to the lands themselves, they would be entitled to recover of Patrick what he had received for them. Waiving this question, however, it is scarcely within the bounds of possibility to suppose that Sophia Felix, if she had located this scrip, would have realized a tithe of the sum her heirs now demand of this defendant. The decree prayed for in this case, if granted, would offer a distinct encouragement to the purchase of similar claims, which doubtless exist in abundance through the Western Territories, (Felix herself having received scrip to the amount of 480 acres, only 120 of which are accounted for,) and would result in the unsettlement of large numbers of titles upon which the owners have rested in assured security for nearly a generation.

In view of all the facts of this case we think the decree of the court below dismissing the bill was correct, and it is therefore

*Affirmed.*

MR. JUSTICE FIELD dissented.