[No 2230. Decided June 25, 1896.]

ELIZABETH W. SACKMAN *et al., Appellants*, v. JOHN A.
CAMPBELL, *Executor, et al., Respondents*.

IMPLIED TRUST — ENFORCEMENT — PLEADING — LACHES — RESCISSION
OF CONTRACT.

In an action by stepchildren against the executor of their step-
father's estate to have same declared a trust in their favor on the
ground that some fifty years before in the year 1842, while they were
small children, he had married their mother and had taken the pro-
ceeds of their father's estate amounting to $5000, and had during
half a century so invested it as to realize an estate worth several mil-
lions, the complaint is subject to demurrer when it appears that
plaintiffs had never pressed their claims for a period of over thirty
years after attaining their majority, and contains the bare allegation
as a reason for such laches, that they had no knowledge of their
rights until the year 1891, their stepfather having concealed the

facts from them and claimed the ownership of the property, but nothing appearing to show fraudulent concealment on his part.

In such a case, in order to avoid the charge of laches, the complaint should make a clear and explicit statement of all matters connected with their failure to assert their rights at an earlier date, including the source of their final knowledge as to their rights, when and how obtained, etc.

A complaint by heirs, which asks the rescission of a contract for the division of property of a decedent's estate, on the ground of false representations and coercion, is demurrable when it appears from the facts pleaded that the parties were dealing at arms' length and that the parties seeking rescission had ample opportunity to know the amount and value of the property to which they were entitled at the time of the contract; and when it further appears that the alleged coercion was a threat of the other party to resign as administrator and delay the settlement of the estate unless they accepted his proposed compromise of their claims, when the effect of such resignation would have entitled such heirs to appointment in his stead to conduct the settlement of the estate, and there is nothing in the complaint showing that such heirs, who were women of mature years, were deficient in ordinary intelligence or incapacitated from transacting business.

In order to rescind a contract on the ground of fraud, an action therefor should be promptly commenced upon the discovery of the fraud.

The fact that a third party who is interested in a contract for the division of certain property is not a party to its abrogation is not a ground for the rescission of the subsequent contract, when it appears that such third party has never questioned or interfered with the agreement entered into between the other parties.

Appeal from Superior Court, Kitsap County.—Hon. JOHN C. DENNEY, Judge. Affirmed.

*Burke, Shepard & Woods,* and *James L. Crittenden (J. J. McGilvra, Sidney M. VanWyck, Jr.,* and *Solon T. Williams,* of counsel), for appellants:

The concealment of a fraud prevents time from running against the injured parties. *Yancy v. Cothran,* 32 Fed. 687; *Carr v. Hilton,* 1 Curt. 390; *Bailey v. Glover,* 21 Wall. 342; *Upton v. McLaughlin,* 105 U. S.

640: *Martin v. Smith*, 1 Dill. 86; *Cook v. Sherman*, 20 Fed. 168.

Trust property may be followed and recovered so long as it can be identified or traced, and no laches can be claimed by a trustee or his executor, when the trustee has fraudulently concealed the facts as to the trust. *Charter v. Trevelyan*, 11 Clark & Fin. 714; *Longworth v. Hunt*, 11 Ohio St. 194; *Moxon v. Payne*, L. R. 8 Ch. App. 881; *Duff v. Duff*, 71 Cal. 513; *Pierce v. Wilson*, 34 Ala. 956; *Beaumont v. Boultbee*, 5 Ves. Jr. 485; *Butler v. Haskell*, 4 Desaus. Eq. 651; *Earl of Hardwicke v. Vernon*, 14 Ves. Jr. 504; *McDonald v. McDonald*, 1 Bligh, 315; *Sweet v. Hale*, Finch, 384. The law looks with special lenity upon any delay of one relative to sue another. *Yeaton v. Yeaton*, 4 Ill. App. 579; *Paschall v. Hinderer*, 28 Ohio St. 568; *Laver v. Felder*, 9 Jur. N. S. 190.

Trustee must act with highest good faith. The trustee must not only not misrepresent, but he must speak. He must tell all he knows and tell the truth to the beneficiary. Nor can he acquire any personal interest in the trust estate so long as the trust relation continues. Lewin, Trusts, 463; *Ex parte Lacey*, 6 Ves. Jr. 625; *Hatch v. Hatch*, 9 Ves. Jr. 292; *Ex Parte James*, 8 Ves. Jr. 345; *Michoud v. Girod*, 4 How. (U. S). 566; *Moore v. Moore*, 4 Sandf. Ch. 37; *Boyd v. Hawkins*, 2 Dev. Eq. 195; *Eberts v. Eberts* 55 Pa. St. 110; *Young v. Hughes*, 32 N. J. Eq. 384; *Fox v. Mackreth*, 1 Leading Cases in Equity (4th Am. ed.), p. 240, American notes; *McCants v. Bee*, 1 McCord Eq. 387; *Howell v. Ransom*, 11 Paige Ch. 541; *Tate v. Williamson*, L. R. 2 Ch. App. Cas. 55; *Hamilton v. Wright*, 9 Clark & F. 111; *Rhodes v. Bate*, L. R. 1 Ch. App. Cas. 256; *Walker v. Symonds*, 3 Swanst. 1.

Misstatements of values avoid trust or compromise

settlements.   Wharton, Contracts, §§ 259, 260; *Hay-garth v. Waring*, L. R. 12 Eq. Cas. 328; *Grimm v. Byrd*, 32 Grat. 300; *Swimm v. Bush*, 23 Mich., 100; *Picard v. McCormick*, 11 Mich. 68; *Birdsey v. Butter-field*, 34 Wis. 60; *Simar v. Canaday*, 53 N. Y. 306 (13 Am. Rep. 523); *Stover's Administrators v. Wood*, 26 N. J. Eq. 420; *Davis v. Jackson*, 22 Ind. 234; *Fisher v. Mellen*, 103 Mass. 504; *McClellan v. Scott*, 24 Wis. 85.   The parties to a compromise contract are bur-dened with precisely the same obligations of good faith and to impart all necessary information, as exist in the case of trustee and *cestui que trust*.   *Perkins v. Gay*, 3 Serg. & R. 331 (7 Am. Dec. 653); *Stapilton v. Stapilton*, 2 Leading Cases in Equity (4th ed.), 1722, American notes; *Gibbons v. Canut*, 4 Ves. Jr. 848; *Gordon v. Gordon*, 3 Swanst. 400; *Wheeler v. Smith*, 9 How. (U. S). 82; *Stewart v. Ahrenfeldt*, 4 Denio, 190; *Baker v. Spencer*, 47 N. Y. 565; *Barlow v. Insurance Co.*, 4 Metc. 270; *Converse v. Blumrich*, 14 Mich. 112; *Mackellar v. Wallace*, 26 Eng. L. & Eq. 64; *Gilbert v. Endean*, L. R. 9 Ch. Div. 259; *Brooke v. Lord Mostyn*, 2 De G., J. & S. 373 ; *Smith v. Pincombe*, 3 Macn. & G. 653; *Broderick v. Broderick*, 1 P. Wms. 239; *McCarthy v. De Caix*, 2 Russ & M. 623.

*Struve, Allen, Hughes & McMicken*, for respondents :

Laches must be explained away by pleadings. *Felix v. Patrick*, 145 U. S. 317 ; *Wetzel v. Minn. Ry. Transfer Co.*, 65 Fed. 23 ; *Teall v. Slaven*, 40 Fed. 774 ; *Wood v. Carpenter*, 101 U. S. 135 ; *Felix v. Patrick*, 36 Fed. 457 ; *Galliher v. Cadwell*, 145 U. S. 368 ; *Beck-ford v. Wade*, 17 Ves. Jr. 87 ; *Johnston v. Standard M. Co.*, 39 Fed. 304 ; *Godden v. Kimmell*, 99 U. S. 201 ; *Marsh v. Whitmore*, 21 Wall. 178 ; *Brown v. County of Buena Vista*, 95 U. S. 157.

Where a party is entitled to rescind a contract on the ground of fraud, he must act promptly, with no vacillation, no unreasonable delay, no attempt to speculate upon his option.  He must elect to rescind, and proceed as far as lies in his power to place himself and his purchaser *in statu quo.  Kinne v. Webb,* 54 Fed. 34; *Thomas v. Bartow,* 48 N. Y. 193; *Flint v. Woodin,* 9 Hare, 622 ; *Floyd v. Brewster,* 4 Paige Ch. 537 (27 Am. Dec. 88); *Minturn v. Main,* 7 N. Y. 220 ; *Saratoga R. R. Co. v. Row,* 24 Wend. 74 (35 Am. Dec. 598); *Follansbe v. Kilbreth,* 17 Ill. 522 (65 Am. Dec. 691 ; *Jones v. Smith,* 33 Miss. 215 ; *Estes v. Reynolds,* 75 Mo. 563 ; *Johnston v. Standard Mining Co.,* 39 Fed. 304 ; *McLean v. Clapp,* 141 U..S. 429.  One seeking to disaffirm a contract should do so at the earliest practicable moment and must return all that has been received under it.  A retention of any portion is incompatible with the rescission of the contract.  *Cobb v. Hatfield,* 46 N. Y. 533 ; *Voorhees v. Earl,* 2 Hill, 288 (38 Am. Dec. 588); *Curtiss v. Howell,* 39 N. Y. 211 ; *Dorr v. Fisher,* 1 Cush. 271 ; *Conner v. Henderson,* 15 Mass. 319 (8 Am. Dec. 103); *Kimball v. Cunningham,* 4 Mass. 502 (3 Am. Dec. 230); *Morse v. Brackett,* 98 Mass. 205 ; *Cook v. Gilman,* 34 N. H. 556 ; *Central Bank v. Pindar,* 46 Barb. 467 ; *Hinchman v. Kelley,* 54 Fed. 65 ; *Grymes v. Sanders,* 93 U. S. 62 ; *Shaeffer v. Sleade,* 7 Blackf. 184 ; *Rynear v. Neilin,* 3 Greene (Iowa), 310 ; *Doughten v. Camden Bldg. Ass'n,* 7 Atl. 479.

The opinion of the court was delivered by

Scott, J.—The plaintiffs have appealed from a judgment of dismissal rendered upon an order sustaining a demurrer to their complaint.  The complaint purports to contain two causes of action.  It is alleged in the first cause of action that in 1840 Joseph

Sylva, then a resident of Philadelphia, died intestate on the high seas, leaving a widow, Sarah M. Sylva and their three minor children, two of whom are the plaintiffs ; that he left an estate consisting of certain personal property which by the laws of the state of Pennsylvania descended one-third to the widow and the remainder to said children ; that about 1842 said widow married one William Renton, and that she and Renton took possession of the estate of Sylva, realizing some $5,000 in money; that with a part of this sum they purchased a sailing vessel in which they with the children went to California and took up their place of abode ; that one of said children died in California, unmarried, and without issue, in 1857, and that her share of the property went, one-half to the mother and the other half to the plaintiffs. It is alleged that at the time of said marriage Renton had no property of his own, but that on removing to California he employed said vessel and the remainder of the proceeds of Sylva's estate in business of various kinds, by the profits of which he realized a large sum of money, with which he dealt in various properties, investing and reinvesting the same; by means of which he accumulated an estate exceeding three millions of dollars in value ; that all of these properties became a trust fund to which the heirs of Sylva were entitled in their distributive shares, and that said Renton became a trustee for them, but never accounted to any of them, or paid over to any of them any of the trust estate; that in 1890 their mother, said Sarah M. Renton, died in this state intestate, then being the wife of said William Renton, and leaving as her sole surviving children, heirs and next of kin the plaintiffs; that in 1891 said William Renton died, having in his possession and under his control said estate

which he had attempted to dispose of by will to other parties; that an executor had been appointed who had taken possession of the estate.

In this cause of action the plaintiffs seek to have the entire estate adjudged to belong to them on the grounds of its being a trust estate now in the hands of the legal representative of said Renton. They claim that they first learned of their Pennsylvania estate and their rights therein in October, 1891, and they allege that Renton had concealed the facts from them; that he occupied the position of a parent to them from the time he was married to their mother, and took them into his house, they then being eight and four years of age; that he always treated them affectionately, maintained and educated them as if they were his children, and that they bore his name and lived with him as his children until they were married.

A number of objections are urged against this cause of action, one of which is that the plaintiffs' rights, if they ever had any, were barred by the lapse of time; that it fails to show sufficient reasons why the plaintiffs remained silent from the time they attained their majority until 1891, a period of over thirty years. The only answer to this is that Renton concealed the facts from them and represented that the property was his own.

We are of the opinion that the demurrer to this cause of action was well taken. The complaint fails to show how the plaintiffs obtained their information in 1891, and the bare allegation that they had no knowledge of the facts prior to that time is overcome by the other matters pleaded. It appears that at the beginning of the action they were fifty-nine and fifty-five years of age, and were women with husbands, and they do not

allege any want of capacity upon the part of themselves or their husbands to attend to or inform themselves of business matters of the character in question. There is no allegation that their mother had withheld from them their parentage or their family history, or that they were ignorant of it. The complaint simply rests upon the bare allegation in this particular, that they had no knowledge of the facts until October, 1891, and that Renton concealed the same from them and represented that the property was his. The plaintiffs having no legal claims upon said Renton and having already obtained over $700,000 worth of property from his estate by virtue of a settlement, as appears in their complaint, when they come into a court of equity and seek from an investment of $5,000 to obtain alleged accumulations amounting to millions, after the lapse of half a century, they must make a clear and explicit statement of all matters connected with their failure to assert their rights at an earlier date, including the source of their final knowledge as to their rights, when and how obtained, etc., in order to avoid a charge of laches. It does not appear that this information, which they acquired so shortly after the death of their mother and Renton, had not been open to them for years. No facts are alleged showing any fraudulent concealment by Renton. His saying that the property possessed by him was his may have been but the honest expression of his opinion only, and the circumstances would indicate that it was nothing more. Considering the parental care he had exercised over these plaintiffs, and the kind and generous manner in which he at all times treated them, it is certainly a most far-fetched claim that he intentionally, persistently and fraudulently, during all of said years, concealed from them the facts connected with

their parentage, and that their real father had left this small amount of property, which he and their mother had taken possession of, and which the plaintiffs represent had grown into this colossal fortune to which they are entitled.

Conceding all that can be legitimately drawn from the allegations in this cause of action, in favor of the plaintiffs, it nevertheless is apparent, beyond all sensible controversy, that the claim is one of the stalest of the stale, and in all reason at this late day and time the plaintiffs should be barred from pressing it, there being no sufficient facts alleged to show any fraudulent concealment or dealing. We are aware that we have uniformly followed a liberal rule in construing pleadings as against demurrers; but the facts apparent from the complaint in this case should make an exception to that rule in considering the bare allegations of the deception by Renton and a want of knowledge on their part. Under all the circumstances shown, good pleading demands that they should allege sufficient facts, with particularity, showing such an exceptional case as would authorize them after all this lapse of time to successfully lay claim to this vast estate accumulated from so small a start. As was said in a somewhat similar case, *Felix v. Patrick*, 145 U. S. 317 (12 Sup. Ct. 867):

" The disproportion is so great that the conscience is startled, and the inquiry is at once suggested whether it can be possible that the defendant has been guilty of fraud so gross as to involve consequences so disastrous."

If so, it is apparent that an exceptionally strong case must be made, and it is not made by the general allegations pleaded. *Hazard v. Griswold*, 21 Fed. 178; *Ambler v. Choteau*, 107 U. S. 586 (1 Sup. Ct. 556); *Kent*

*v. Snyder,* 30 Cal. 667; *Cole v. Joliet Opera House Co.,* 79 Ill. 96; *Brereton v. Hull,* 1 Denio, 75.

The second cause of action relates to the same property, and by it the plaintiffs seek to recover a portion of the estate only. Much that has been said in relation to the first cause of action, as well as the cases cited, bears with equal force upon this one also. We will not pass upon the question of the inconsistency of the two claims, but will consider the second cause pleaded independently of the other in this respect. In this it is alleged that the property was the community property of William and Sarah Renton, and that on the 24th day of February, 1888, they made a written contract for the purpose of regulating the disposition and status of a part of said property. The death of Sarah M. Renton is alleged, and that thereupon the plaintiffs became entitled to one-half of the property by descent from her, and that the other half of it belonged to William Renton. It is alleged that this contract provided for the appointment of a trustee of the community estate who should manage and control it in its entirety until January 1, 1900, and that shortly after the death of Sarah M. Renton said William Renton was, by the superior court of Kitsap County, that being the court of probate, appointed such trustee, and also administrator of the estate of his deceased wife, and that he qualified as such and filed an inventory of the property in that court, but that he claimed a large portion of the estate as his separate property; that an appraisement was had, the usual notice to creditors given, the debts of the estate paid, and the estate brought to a condition for partial distribution. That then he proposed to the plaintiffs that the trust created by the community property contract be abrogated and the property divided between himself and the plaintiffs,

and that the plaintiffs and said Renton entered into a
written stipulation or agreement accordingly, whereby
plaintiffs agreed to take in full settlement certain real
and personal property and release their claims to all
the other property.    This stipulation recites the com-
munity contract entered into by William and Sarah
Renton aforesaid, the appointment of William Renton
as said administrator after due notice, and that the
plaintiffs were represented at the hearing; the filing
of the inventory and appraisement, the payment of all
the debts and the desirability of a decree of partial
distribution, etc., and they thereupon applied to the
court for a distribution and settlement of the prop-
erty in accordance with the terms of said agreement;
and on the 26th day of June, 1891, the court, upon
the mutual application of the parties, entered a decree
of distribution in accordance with said stipulation,
and deeds were subsequently executed and delivered
between the plaintiffs and William Renton in pursu-
ance of such agreement, and the decree of the court.
It is alleged that at that time William Renton knew
the location, character and value of all this property,
and knew all the facts in regard to its real ownership,
and the rights of the parties to it, but that the plain-
tiffs had only a very slight knowledge of the property,
of the origin of its title, and the facts determining its
character and value, and had but scanty means of sup-
port for themselves and their families, and were
dependent upon the honesty and fairness of Renton,
and that they stood towards him as beneficiaries to-
wards a trustee; that Renton claimed that the portion
which he proposed the plaintiffs should take was of
much greater value than its true value, and that the
portion which he was to take was of far less value
than its true value, and that the two were of equal

value; that Renton represented that all the property
in his hands excepting that specially described in the
community property contract was his separate prop-
erty, whereas in fact, so far as it was not subject to the
Sylva trust pleaded in their first cause of action, it was
community property; that he threatened, unless they
agreed to the compromise proposed by him, to resign
as administrator, cause another to be appointed, throw
the whole matter into court for a partition, and thereby
cause great expense and delay, which the plaintiffs
with their scanty means of support were not able to
endure; that the plaintiffs were opposed to this divi-
sion and tried to induce Renton not to insist upon it,
but to pay over to them the income coming to them
under the community property contract, all of which
he refused to do; and finally, believing his false repre-
sentations to be true in point of fact, and being coerced
by his threats and at his mercy, they did sign the
written agreement aforesaid on the 4th day of March,
1891; that the property so distributed by the court and
settled upon William Renton in pursuance of such
agreement was then and is now worth more than
$1,775,000, but that the property settled upon the
plaintiffs by virtue thereof was not and is not in all
worth more than $725,000, and that at the time Ren-
ton refused to include in said estate a large amount of
other property claiming that it was his separate prop-
erty; that the plaintiffs had no interest in it, etc., and
this additional property was and is now worth more
than $350,000; that the plaintiffs did not discover that
the representations of William Renton as to the own-
ership and values of said property were false until
after his death, and a few months before this suit was
commenced, and that but for their ignorance of said
matters and for Renton's representations, they would

not have executed said written agreement nor made the deeds in pursuance of it; that the community property contract entered into between Renton and his wife affected Renton's share in the property of the partnership of Renton, Holmes and Company, of which firm Charles S. Holmes and William Renton were members, and that said Holmes was interested therein, and that he was not a party to the abrogation of the community property contract and did not consent to it, and without his consent that such agreement was without force. And furthermore that William Renton could not enter into said agreement with the plaintiffs by reason of his position as administrator of the estate of Sarah Renton, and as trustee under the community property contract, and of the plaintiffs' position as heirs of Sarah Renton and as beneficiaries under that contract; that upon discovering the true facts in the case, and that Renton's representations were false, the agreement had been disaffirmed and rescinded by the plaintiffs. The complaint also contained an offer to account for and restore the property received by them. The death of Renton was alleged and the appointment of an executor for his estate. Much more is contained in the complaint to which it is unnecessary to call attention.

But we are of the opinion that sufficient grounds to warrant a rescission of the written agreement entered into between the plaintiffs and Renton, and to authorize a cancellation of the deeds of conveyance thereafter executed in pursuance of it, have not been pleaded. While a want of knowledge of the value of the property is alleged, there is nothing to show that the plaintiffs did not have ample opportunity to inform themselves of its value and condition. It is conceded that their suspicions that Renton had

defrauded them were aroused in March, 1892. The action was not commenced until a year later. To excuse this it is claimed by them that it took them some months to ascertain the facts after they began an investigation. But it appears that they were parties to the probate proceedings from the beginning and were actively participating therein in July preceding the month of March when the stipulation was entered into. Inventories of the community property had been filed and the property appraised. This was a proceeding in court under oath, and the correctness of the inventory and appraisement is not attacked. In fact, the complaint fails to show what the appraised value was. The plaintiffs practically rest upon the bare assertion that Renton fraudulently misrepresented the values and ownership of the property, and that they relied upon his representations. There is enough in the complaint to show that the parties were in fact dealing at arms' length and that Renton had little or no vantage ground over the plaintiffs. According to the stipulation they were in a position to receive their property from the court on the basis of the probated community property contract. The indebtedness of the estate had been paid and their rights were judicially established. All things were ready to place them in the exact situation of their mother from whom they inherited this property. They saw fit not to stand upon this community agreement, but to make another and different arrangement for themselves.

Their claim that they were coerced into this agreement by Renton can hardly be regarded with seriousness. His threat was that he would resign and have another administrator appointed and leave the matter for the determination of the court. The only re-

sult of this would have been to have substituted them
to their mother's position,—the very relief they are
now seeking. In fact, with Renton's resignation on
file they would have had the additional right as sole
heirs of their mother to have been appointed in his
stead to conduct the further settlement of the estate.
When Renton undertook by threats, as they allege, to
coerce them into the compromise against their will,
being women of mature years, not shown to be in-
capacitated from transacting business or so deficient
in common knowledge as to be unable to attach the
ordinary meaning to such conduct upon his part,
that he was thereby seeking to obtain an advantage
over them in the settlement, they should at once have
been placed upon their guard and have informed
themselves fully of the matters involved, if they were
not already possessed of that information. They did
not do this, nor did they proceed diligently upon the
discovery of the alleged fraud. The stipulation was
entered into in March, 1891; the decree was rendered
thereon in June following. They discovered the
alleged fraud in the settlement in March, 1892, but
did not commence their action until one year or more
later. Meanwhile, from time to time, they had been
selling portions of the property obtained by them
from Renton, both before his death and afterwards.
They allege that these sales were made with the con-
sent of Renton and with the consent of his executor
after his death. It is apparent by this that their
knowledge of the values of the property was such that
they were willing to place that part of it received by
them upon the market.

Furthermore, it appears in their first cause of action
that they knew of the Sylva trust ·in October, 1891,
and according to their contention therein they knew

that the property was all theirs, and that Renton had fraudulently concealed this from them and undertook to retain it as his own. The court cannot shut its eyes to this allegation of knowledge upon their part. Inconsistent allegations of fact of which the parties must have had personal knowledge must be construed against the pleader. If they knew that the property was all theirs under this Sylva trust, what mattered it, and how was any additional fraud practiced upon them by Renton's representing that a portion of the estate was his separate property? The allegation of a misrepresentation of the values of the property by him also is deprived of much of its force in the light of this prior allegation. Being possessed of all of this information they saw fit to enter into the contract of settlement, and from October, 1891, until April, 1893, after the death of Renton, when they commenced their action, they did little or nothing towards obtaining the cancellation of that settlement and the setting aside of the decree of the court thereon, and the deeds executed by them in pursuance of it. If, after entering into this agreement, they had a right to have it set aside on any ground, they should have proceeded promptly, without unreasonable delay, under the well settled rules of equity, and they did not do so. If they were possessed of the facts, as it seems to us they were, sufficiently to enable them to deal intelligently, they could attack the settlement only upon the ground of having been coerced into it by Renton. But there was as little basis for this claim of coercion as for the other, and there is no sufficient foundation for either cause of action.

The further claim that the agreement of settlement entered into between the plaintiffs and Renton was invalid because Holmes was not a party thereto is not

well founded. It does not appear that Holmes has ever questioned it, and it is apparent that at the time the agreement was entered into the plaintiffs knew Holmes' relations to the property in question. It is not claimed that they have any other or different information upon that subject now than was possessed by them at that time. With this knowledge they saw fit to enter into the agreement, and it was carried out without any interference by Holmes.

The judgment of the lower court is affirmed.

HOYT, C. J., and DUNBAR and GORDON, JJ., concur.