## MILLER v. RUSH et al.

(Circuit Court of Appeals, Fifth Circuit.  December 1, 1921.)

No. 3685.

1. **Cancellation of instruments ⊜34(1)—Right to cancellation for fraud lost by failure to use diligence.**

The right to rescission or cancellation of a deed because of fraudulent representations is lost, if the party seeking such relief fails, after discovering the falsity of the statements, to use reasonable diligence to disaffirm it, and notice of facts and circumstances which would put a man of ordinary prudence and intelligence on inquiry is equivalent to knowledge of all the facts a reasonably diligent inquiry would disclose.

2. **Deeds ⊜75—Right to cancellation for fraud held lost by ratification.**

After complainant and her husband had conveyed land in Texas to defendants in part consideration of a certificate entitling them to certain land in Mexico, they visited the vicinity of the Mexican land and there found that many of the representations of defendants with respect to the character and value of the land and its nearness to town and market were false, and became convinced that it was worthless and doubtful of defendants' title. After their return, and the death of her husband, complainant for a further consideration executed a new conveyance of the Texas land to one of the defendants, expressly confirming the prior deed. *Held*, that such conveyance was a ratification, which deprived complainant of the right to cancellation of either deed on the ground of the original fraudulent representations.

Appeal from the District Court of the United States for the Northern District of Texas; James C. Wilson, Judge.

Suit in equity by Mrs. Kate Miller against J. M. Rush and Claude McCauley.  Decree for defendants, and complainant appeals.  Affirmed.

George E. Miller, of Fort Worth, Tex., and R. N. Grisham, of Eastland, Tex., for appellant.

J. M. Wagstaff, of Abilene, Tex., for appellees.

Before WALKER, BRYAN, and KING, Circuit Judges.

WALKER, Circuit Judge.  This was a bill in equity filed in March, 1919, by the appellant, Mrs. Kate Miller, praying the cancellation of a deed executed on September 30, 1910, by the appellant and her then husband, J. T. Miller, to the appellees, J. M. Rush and Claude McCauley, conveying 324½ acres of land in Stephens county, Tex., which was community property of the grantors, and of a deed executed in April, 1912, by the appellant individually and as the community administratrix of the community of herself and her then deceased husband to the appellee J. M. Rush, conveying the same land, and expressly confirming the first-mentioned deed.

The basis of the relief sought was alleged false statements and fraudulent representations made by said Rush, acting for himself and his codefendant, McCauley, to the appellant and her husband, whereby the latter were induced to execute the first mentioned deed.  The consideration recited in that deed was $6,500.  The actual consideration

for the land conveyed by that deed, which was of the value of $3,000 at the time that deed was made, was $1,000 in cash paid to the grantors, the assumption by the grantees of $315 balance of purchase price therefor owing to the state of Texas, and the delivery to the grantors of a land certificate executed by the Rio Cajones Company, entitling the holders of such certificate to a described tract of land, containing 600 acres and constituting a part of block 35 of a large body of land known as the Rio Cajones estate, in the state of Oaxaco, republic of Mexico. The alleged representations included one as to the climatic conditions in that part of Mexico in which the Rio Cajones lands are located, and others to the effect that the tract traded to the appellant and her husband was located within 3½ miles of a thriving town called Bailey, in which were schools and churches, that that tract was fine and fertile, and that there was a good road, a public highway, leading from Bailey to the larger towns and markets situated in Mexico, where products of the lands in that part of the country could be disposed of.

After the filing of an answer to the bill, a special master was appointed to take testimony and to report his conclusions of fact and of law. The master's findings of fact included the following:

"I do find that said Rush led the Millers to believe that there were churches and schools in or near the vicinity of the town of Bailey, but I do not find that said Rush represented the land in block 35 to be of any particular value, nor that the country was good for any particular kind of disease, nor that block 35 was in 3½ miles from the town of Bailey, and I do not find that he agreed with the said Millers that, if they were not satisfied with the said land when they went to Mexico, he would trade back with them and give them $1,000 for the expenses they were out, or that he made any agreement with the Millers to that effect. While I am unable to find from the testimony that defendant Rush made any direct statements as to the lands in block 35, I do find that J. T. Miller and wife were led to believe said lands in ʰblock 35 were good lands and fertile, from the statements of said Rush; that he had been to the town of Bailey, and that the lands in that vicinity were rich and fertile.

"I further find in this connection that after complainant and others in company with them went to Bailey and upon the Rio Cajones estate, that they then found that some of the things that Rush had led them to believe were not true and that the complainant afterwards and on April 12, 1912, confirmed the trade and agreed to accept the land in Mexico with the defendant Rush as hereinafter stated in paragraph 23 of these findings.   *   *   *

"I find that complainant and her husband, with their family and a number of other people, moved to the Rio Cajones colony about the 1st of December, 1910, and that complainant and her husband remained there some two months in the town of Bailey, which was about 10 miles from the lands described in the certificate given to complainant and her husband, and that complainant and her husband became dissatisfied with the country and returned to the United States, and to Cisco, Tex., arriving at Cisco about February, 1911.

"I find that the said J. T. Miller and complainant, while in Mexico, became acquainted with the climate of the country, the general character of the Rio Cajones lands, the conditions as to churches, schools, and roads, and that it was a tropical country, and that they became acquainted as to the surface of the country, including the mountains near by and the dense jungles of underbrush on said lands in general, in and around Bailey and on the Rio Cajones estate; and I further find that they did not go to visit the lands called for in that certificate, and that they never saw the same.

"I find that, while J. T. Miller was in Mexico, he was informed as to the probable character and quality of the land in block 36. I find that, upon

what complainant and her husband could see from the town of Bailey, they were put on notice of the fact that the land called for in said certificate was probably rough and rolling, and not easily accessible, and not suitable for farming as American farmers farmed; although I find that the land would produce coffee and other products raised in Mexico, that it was covered with valuable timber, and I do not find that the land is worthless.

"I find that on arrival of the said Millers at Cisco, on their return to Texas, that they were dissatisfied with the trade they had made, and expressed their dissatisfaction to J. M. Rush and McCauley, and negotiations were had between the parties for settlement of their differences, but no agreement was arrived at before the death of J. T. Miller, who died about April, 1911.

"I find that, after the said Miller died, the said McCauley and Rush, after negotiating with Mrs. Miller, about June, 1911, agreed to deed her back the land in Stephens county for the sum of $1,500, with no cash consideration, but for six vendors' lien notes on said land, each for $250, running from one to six years, with 10 per cent. interest, the said McCauley and Rush had theretofore paid to the Millers on the trade for the land $1,000, and in case Mrs. Miller accepted this deed and executed the notes, this would be the final settlement between the parties, the defendants to have the Mexico lands and personal property turned over to them at the time of the trade; and I find that the said McCauley and Rush executed a good and valid deed to Mrs. Kate Miller on the above premises and tendered to her, but Mrs. Miller declined to accept the deed and execute the notes.

"I further find that the parties continued to negotiate settlements of the matter, and arrived at a settlement of the matter about April 12, 1912, by the terms of which agreement J. M. Rush, who then owned the entire interest in the land, paid to Mrs. Miller $440 in money and personal property, and Mrs. Miller, in order to make full settlement of the matter, was appointed community administratrix of the estate of J. T. Miller, deceased, and herself, and she then, after such appointment and qualification, accepted said money and personal property, and conveyed to J. M. Rush the land in controversy, as shown by deed from Mrs. Miller, dated the 16th day of April, 1912, filed for record in the county clerk's office of Stephens county, Tex., on the 28th day of January, 1914, and in said deed it was provided that said Rush would convey to the said Mrs. Miller the land called for in her certificate, given at the time of the original trade, within 9 months from said date. And I find that the parties on each side fully agreed to this as a full and final settlement of the matters in controversy, and that no fraudulent representations were made by defendant at the time to induce complainant to make the deed. * * *

"I find that J. T. Miller and complainant went to Mexico and lived there some two months, in 1910 and in the early part of 1911, and lived within 9 or 10 miles of the land in controversy, and by the use of reasonable diligence they could have found out the character of the land and its value and the title to the land, and she could have done this within 6 months after the original trade in September, 1910, and that while she was in Mexico she came to the conclusion that the land was worthless and that defendants had no title to the same, as shown by her testimony.

"I find that complainant, from her own testimony, at the time she made settlement with J. M. Rush in the spring of 1912, did not believe that Rush could make her a title to the land in Mexico, and that she believed Rush did not have title to the land in Mexico, and that he could never make title to the land in Mexico, and that the lands of the Rio Cajones estate were unfit for white persons to reside upon, and that the land covered by her certificate was practically worthless. * * *

"I find that oil was discovered about six miles from this land about the first of the year 1917, and the Ranger field was discovered in October, 1917, which is about 30 miles from this land, and that thereafter the land in controversy arose in value very rapidly and that said land is now worth $1,500 an acre; that there has been no special change in value from the time defendants purchased the land until the discovery of oil."

The land called for in the certificate delivered to the appellant and her husband is about 10 miles west of Bailey, and is rough and mountainous. The following are extracts from the testimony of the appellant:

"There was no town at Bailey. There was one little store, but no town. * * * There were no churches or schoolhouses at Bailey. The country lying west of the town of Bailey was just mountains and rocks and timber on it, and hilly and jungles, and vines, and no one could go through it without cutting their way. There were no roads where we were at all. * * * When we got down there, we found that land Rush was giving us was 10 or 15 miles away from Bailey. Mr. Rush told us it was 3 miles. * * * The ants and insects in that country were so bad that it was not fit for a nigger to live in; a person could not live there. I knew that when I left Mexico, and that is why we left. We could not stay there. I knew there were no school or churches at Bailey, and no roads. I did not know it till I went down there. I found out down there in Mexico that everything McCauley and Rush had told me was untrue, except as to the title of the land, and we found it was not so, what they told us, and I had a sort of idea that they didn't have any title to the land. We had a pretty good idea when we got back that they didn't have any land down there. That was my judgment at that time. * * * I understand that this land about which we are bringing this suit lies 9 or 10 miles west from the town of Bailey. I did not go out to that land, and could not have done so, had I tried, because of the mountains and hills and jungles and rocks. * * * No one told me before this suit was brought that this land was worthless. Of course, if Rush had told us that that Mexico land was all covered with brush and jungles and rocks and mountains, etc., and was such land as I understand it is, I would never have agreed to the trade. In 1912, when I made that land trade, I thought then that I might be able to make some disposition of that land. * * * When I was in Mexico the 2 months I found that nothing was like Rush and McCauley said it was. I saw the mountains west of us, and knew they claimed our land was west of us. * * * When I left Mexico, I thought that land down there was not fit for anything, and I think that yet. It would not have been any account to live on, if it had been level. When we came back. I thought maybe Rush could give us a good title to the land; he said he could. I believed everything he told me about the land was false."

The above-mentioned deed, executed by the appellant in April, 1912, contained, after a recital of the receipt by the appellant of $440 in cash and in property at reasonable cash value, and immediately following the granting and habendum clauses of the deed, the following:

"It is expressly understood and stipulated that this deed is made for the purpose of vesting the title of the above tracts of land in said J. M. Rush absolutely, for the consideration hereinbefore stated, and in full confirmation of a deed made by the said J. T. Miller and myself as the wife of said J. T. Miller to said Claude McCauley and J. M. Rush, conveying to them said land on September 26, 1910."

[1] The right to a rescission or cancellation of a deed or contract because of fraudulent representations is lost, if the party seeking such relief fails, after discovering the falsity of the statements whereby he was influenced to enter into the transaction, to use reasonable diligence to disaffirm it; and notice of facts and circumstances which would put a man of ordinary prudence and intelligence on inquiry is, in the eye of the law, equivalent to knowledge of all the facts a reasonably diligent inquiry would disclose. Shappirio v. Goldberg, 192 U. S. 232, 24 Sup. Ct. 259, 48 L. Ed. 419; Grymes v. Sanders, 93 U.

S. 55, 23 L. Ed. 798; Wood v. Carpenter, 101 U. S. 135, 25 L. Ed. 807; Rugan v. Sabin, 53 Fed. 415, 3 C. C. A. 578; Scheftel v. Hays, 58 Fed. 457, 7 C. C. A. 308.

[2] The appellant, while in Mexico, not only was fully apprised of the falsity of most of the representations by which she claims that she and her husband were influenced to execute the deed of September 30, 1910, but acquired knowledge of facts plainly indicating that the land in Mexico which they were to get in the trade was not of the character and quality corresponding with the alleged representations in that regard. She saw enough to suggest to a person of ordinary prudence and intelligence that that land was such as it turned out to be. She learned that it was located in a rough, mountainous region. It well may be inferred that a reasonably diligent inquiry made at that time would have led to an ascertainment of the actual character and quality of that land—of all the circumstances affecting its value or desirability.

It is apparent from the appellant's own testimony that when she returned from Mexico she did not believe that that land in any material respect was such as she claimed it had been represented to be. Her testimony discloses that, when she executed the deed of April 6, 1912, she had ceased to believe in the truth of any of the above-mentioned representations claimed to have been relied on when the previous deed was executed. The later deed, which was supported by a new valuable consideration, was a conveyance of the same land and a confirmation of the previous one. It evidenced the appellant's election not to rescind the first deed. Unless the last deed is voidable, the execution of it left the appellant without any legal or equitable interest in, or claim to the land.

It is not claimed that the appellant was induced or influenced to make it by any fraudulent representation made after the execution of the earlier deed. The last deed is not subject to be cancelled because of the alleged misrepresentation as to the character and quality of the land, whereby it is claimed that the appellant and her husband were influenced to make the first deed, as the appellant's own testimony convincingly shows that, when she executed the last deed, she did not believe that those representations were true, and was not influenced or induced thereby to change her condition. A transaction is not subject to attack because of representations which the complaining party did not believe, and upon which he did not rely when that transaction was entered into. Ming v. Woolfolk, 116 U. S. 599, 6 Sup. Ct. 489, 29 L. Ed. 740.

The evidence adduced fully warranted the conclusion that the appellant's deed of April 6, 1912, was such a ratification of the transaction evidenced by the previously executed deed of herself and her husband as had the effect of depriving the appellant of any right to have either of those transactions cancelled on any ground now urged against them.

It follows that the decree appealed from should be, and it is, affirmed.