## WOODWARD et al. v. MACKENZIE.

Circuit Court of Appeals, First Circuit.
March 16, 1929.

No. 2309.

Nelson Gammans, of New York City, Henry G. Molina, of San Juan, Porto Rico, and Ezra P. Prentice, of New York City (O. B. Frazer, of San Juan, Porto Rico, on the brief), for appellants.

Herbert Barry and Chester W. McNally, both of New York City (Henri Brown, of San Juan, Porto Rico, on the brief), for appellee.

722

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. This appeal presents a family controversy over property.

The plaintiff, Mrs. Margaret MacKenzie, was born in Scotland in 1852, and was twice married. By her first marriage she had two children, John Gillies and Susie Gillies; by her second marriage, two daughters, the defendant Prudence M. Woodward and Mrs. Margaret Belcher. Prudence was married to defendant Jeremiah D. Woodward in 1905 and divorced from him in 1925. They had two daughters. Margaret, the older, in 1925 married a lawyer, Chester W. McNally. In 1926 plaintiff went to live with the McNallys, in New Jersey, and McNally persuaded her to bring this suit on June 2, 1927, without previous demand or notice. McNally appears as counsel for plaintiff and as a witness. The suit was instituted and is being financed by him. The other personal defendant is Costas, who from boyhood was an employee of the defendant corporation, Gillies & Woodward.

Summarily stated: Plaintiff complains that she owned 27 of the 50 shares of the defendant corporation, by inheritance from her son John D. Gillies, who died January 2, 1916, and that she was fraudulently induced by her daughter and her daughter's then husband, Jeremiah, to transfer these shares, one to Costas, seven to Jeremiah, and nineteen to Prudence; that she is entitled to rescind these transfers and recover the shares, together with all dividends paid thereon; that her daughter and son-in-law also illegally misappropriated large sums of money belonging to the corporation; and that as an alleged stockholder she is entitled in this suit to require repayment of such withdrawals, together with interest.

The answers not only deny all the material allegations of fact, but set up laches, prescription (limitation), and misjoinder of defendants and of causes of action.

The conclusion we have reached on the merits makes it unnecessary for us to determine whether such a combination of separate claims and separate defendants as is here made can be united under a single unit, under the most liberal interpretation of equity rule 26.

After a long trial (a record of 600 pages) the court below in a brief opinion found that the Woodwards, as long ago as in 1916, conceived a plan to defraud the plaintiff of her stock, carried out by falsely and fraudulently informing her that the corporation was insolvent, and by causing her to transfer her stock into the name of her daughter Susie, without her knowledge or consent. The judge overruled, without discussion, the legal defenses set up.

The decree required plaintiff's daughter, Prudence, to turn over to plaintiff nineteen shares of stock, with dividends amounting (with interest) to about $40,000, less $12,000, with interest, paid for this stock by Prudence. It required Costas to surrender one share, with back dividends and interest amounting to about $2,000. It required Jeremiah to surrender seven shares, with back dividends and interest amounting to about $15,000. It also required Jeremiah to repay to the corporation about $40,000, with interest from various dates, and referred the case to a master for further accounting.

Both the findings and the rulings are unwarranted, giving the fullest weight to the conclusion of the trial court, that saw and heard the witnesses.

While Mrs. MacKenzie, at a preliminary hearing on a motion to inspect the corporation's books, under oath, denied her signature on the stock certificates, and offered expert evidence of forgery, the signatures are all now admitted. These documents control. It is rare that a court is asked to sustain a case of alleged fraud that starts with a known false charge of forgery. The facts of controlling importance, undisputed or shown by the overwhelming weight of evidence, are as follows:

John D. Gillies went to Porto Rico shortly after the American occupation. By 1907, he was attached to the insular police force, and also had a barber shop in San Juan, where he sold newspapers, cigars, etc. The Woodwards and Mrs. Gillies, with her unmarried daughter, Susie, lived in Detroit; Woodward had had experience in the cigar business. In 1908 he went to Porto Rico and became, as he testified, an equal partner with his brother-in-law, Gillies, in the ownership and operation of the barber shop and its petty merchandising business. In July, 1908, the firm was incorporated under the name of Gillies & Woodward, with capital stock, apparently paid in, though not in money, of $5,000; while Woodward claimed to be an equal partner, a record then made indicates that it was agreed that Gillies should have twenty-seven shares, Woodward twenty-two, while one was issued to an outsider, apparently belonging beneficially to Woodward. No stock certificates were issued, no meetings held, no minutes and no regular books kept.

The corporation was probably formed because of fear of suits against Gillies, one of which was actually brought in 1910, and an attachment made on the barber chairs, etc. It was then, in form, a petty corporation, carrying on a petty business. During the next 7½ years Woodward several times came to the states, made connections with various large tobacco concerns, and introduced the sale of American cigarettes into Porto Rico. The cigarette business thus begun by Woodward is, broadly speaking, the source of nearly all the prosperity afterwards attained by the concern, and thus the cause of this controversy.

In 1908, the Woodward family, with the plaintiff and Susie Gillies, went to Porto Rico; they all lived with John D. Gillies as one family, supported by the business carried on by Gillies & Woodward. No attention was paid to the requirements of corporation law; there was no real bookkeeping system; the two owners drew money as they chose, for both personal and family expenditures.

Late in 1915, all the family except John D. Gillies returned to Detroit. Woodward was critically ill and subjected to a serious operation on the brain, which disabled him for months. On January 2, 1916, John D. Gillies died in San Juan. The financial status of the business was bad; the debts were about $28,000, with cash less than $1,500. Woodward was still ill. Friendly receivers were forthwith appointed, who managed the business for some months. An accountant employed by the receivers opened a set of books and prepared stock certificates, dating them back eight years to 1908, when (as he properly thought) they should have been issued. This was the first substantial step taken by this concern to conform to any of the requirements of corporation law or corporation business methods.

The opinion of Cochrane, one of the receivers, and an experienced banker, that the concern was then insolvent, is fully warranted by the evidence; for the main asset items —receivables, stock on hand, furniture, and fixtures—were plainly not worth anything like their book value; if the concern had then been liquidated, the creditors could not have been paid in full. Plaintiff was the only heir of her deceased son. She gave her daughter, Prudence, a general power of attorney; Mrs. Woodward went to Porto Rico with that power, turned it over to a local lawyer, who took the appropriate steps to settle Gillies' estate. He filed an account which showed that Gillies owned twenty-seven shares of stock in Gillies & Woodward. There is not a scintilla of evidence that this power of attorney was ever used for any other purpose than to enable Mrs. Woodward to settle properly, for her mother, the estate of John D. Gillies, or that it thereafter figured in any of the transactions now complained of. The implication in the opinion of the court below that this power of attorney was a factor in these transactions is entirely without warrant. Equally unwarranted was the charge in the bill (now abandoned) of any concealment or any misdoing by Prudence in relation to the settlement of her brother's estate.

She reported by letter to her husband in Detroit concerning the business conditions, sending him a list of the creditors. In the spring of 1916, as Woodward recovered his health, he visited the chief creditors in the states, assured them that the debts of Gillies & Woodward would be paid, and thereby obtained their confidence and laid the foundation for his subsequent profitable relations with those concerns. Later he returned to Porto Rico, and then arranged for a composition with the creditors—10 per cent. every 3 months for 2½ years. Substantially assisted by his wife, Woodward worked vigorously, faithfully, and successfully to pay off the creditors and to save the concern from bankruptcy. The finding of the court below, "That in 1916 the said defendants Prudence M. Woodward and Jeremiah D. Woodward conceived a plan to defraud complainant of her shares of stock and interest in said corporation," is not only unsupported by the evidence, but is affirmatively contradicted by the indisputable facts and all the credible evidence. Except for the work and business capacity of Woodward, substantially assisted by his wife, Mrs. MacKenzie's twenty-seven shares of stock were worthless. Largely before 1916, entirely thereafter, the corporation business was a Woodward business, carried on under the name and style of Gillies & Woodward.

There were various easy ways by which the Woodwards might then have legally and entirely eliminated Mrs. MacKenzie from any interest in the business. Woodward's connections with the tobacco concerns in the states were the only assets having any potentiality of profits or future business. If, as complainant now contends, the concern was then solvent, Woodward might from its assets have paid the creditors in full and thus kept their favor, and then have taken over the business, with its connections in the states, for himself. Instead of taking that

not unnatural course, Woodward (and his wife) carried on and developed the business under the corporate name. His work, management, and business connections were, practically and as a business proposition, the sole basis of even a speculative or future value in the plaintiff's twenty-seven shares of stock. This stock was then unmarketable, except possibly to a competing concern desiring control for elimination of competition. In essence, it was nothing but a claim on the future earnings of Woodward and his wife, if they were to work through this corporation. This aspect of the case is fundamental, and must be kept in mind when considering the future conduct of the parties.

On December 18, 1916, the plaintiff transferred these twenty-seven shares to Susie; she has never been a stockholder since. The widowed mother and unmarried daughter were naturally very close to each other. Mrs. MacKenzie in her testimony says, "What was one's was the other's, between me and Susie." Her natural and proper desire was so to arrange that this stock, with its possibilities for the future, in case of her death (naturally expected to precede her daughter's), would belong to her daughter. She did this by the usual formal assignment of the certificate to Susie. There is no credible evidence on which to ground a finding that, from December 18, 1916, these twenty-seven shares were not the property of her daughter and subject to her uncontrolled disposition, in fact (and with her mother's knowledge and approval) exercised.

■ There is nothing in plaintiff's contention that her gift was void, under the Porto Rican Civil Code, § 642, which provides that,

"A gift may include all the actual property of the donor or a part thereof, provided the latter reserves, by legal title or in usufruct what is required for his support in a condition corresponding to his circumstances."

If we assume, but without deciding, that the mother and daughter had become domiciled in Porto Rico, and that for that or any other reason the transfer is to be determined under Porto Rican law, the authorities are clear that such gift is not void ipso facto, but only if and when it is affirmatively shown that the donor did not retain enough for support, and that then it is valid for any excess not needed for the donor's support. 5 Manresa, 634; 2 Scaevola, §§ 634, 636.

When Mrs. MacKenzie gave these shares to her daughter, they were not only (as pointed out above) of no more than speculative value, but she had other property—houses, a farm, and a life estate in two other houses from her deceased husband, MacKenzie. She kept her real, income-producing properties. The gift in 1916 of twenty-seven shares of stock, then paying its creditors under a moratorium having more than two years to run, cannot, on this record, be held void either under civil or common law.

■ The conclusion that plaintiff is neither in law nor in equity a stockholder in Gillies & Woodward is enough to dispose of the case; but in view of the charges of serious wrongdoing, we think it well to deal with some other aspects of the case. In February, 1920, Costas, who had been in the employ of the concern for many years, sought an increase in salary. Thereupon Woodward proposed to Susie that each of them transfer to Costas one share of stock to give him an interest (4 per cent.) and thus induce him to continue at the old salary. Susie agreed; this was done, with plaintiff's knowledge and approval. It is this share that the court below holds Costas must surrender to the plaintiff. There is neither allegation nor evidence that Costas was guilty of any fraud or misrepresentation to plaintiff or to Susie Gillies. The two shares of stock (one from Woodward and one from Susie) were transferred to him in lieu of probable increase of salary, and in that aspect for a valuable consideration; he took and holds the share in good faith. The findings that he is accountable to the plaintiff for his share of stock and the dividends he has received thereon are without even excuse, much less justification.

■ In December, 1920, Susie Gillies transferred to Woodward seven shares of her stock, without present money payment therefor, pursuant to his suggestion that he ought, as business manager of the concern, to have the majority of the stock of the corporation. The transfer was not really without consideration; for, during the previous period of nearly four years, the family had been living out of the business—actually from Woodward's earnings. Part of this time Susie had had a salary or drawing account; so had Mrs. MacKenzie. Both had been officers of the corporation. Woodward was entirely justified in regarding himself as not only the manager of the business, but as, in the main, the support of his mother-in-law and sister-in-law. This transfer was duly made; there is no evidence upon which it can be held invalid.

■ In August, 1920, Woodward wrote to plaintiff and Susie, jointly, a letter which furnishes practically the only plausible excuse for charging him with any unfair deal-

ing with these women. A dock strike had then tied up some $16,000 worth of imported cigarettes, which speedily spoil in that climate, so that Woodward was in serious and discouraging troubles. But the letter exaggerated the dangers, and contains intimations of a purpose to close up the business and get a position with one of the tobacco houses on "straight salary and a commission," and a hint that he might buy the outstanding majority interest. If the plaintiff had then owned any stock, and if the evidence showed that she sold it at an inadequate price in reliance on this letter, it would be necessary to consider carefully its relation to any wrong suffered. But nothing of the kind occurred. On the contrary, plaintiff expressly negatives any possible legal significance of this letter:

"Q. * * * After getting this letter of 1920, did you transfer some shares to Jerry in view of what he said here? A. No; I transferred no shares to Jerry.

"Q. You transferred no shares to Jerry? A. No.

"Q. Then, when you got this letter of 1920, it didn't really worry you at all? A. No.

"Q. And you didn't even answer it? A. Susie always attended to the correspondence.

"Q. Did you see the answer that she sent? A. I don't remember.

"Q. And you didn't transfer any shares because of that letter? A. No."

The letter was plainly regarded by plaintiff as but one of the frequent expressions of Woodward (described by one witness as "a born pessimist"), "Business is rotten." Irrelevant to the real issues, this letter has been used to give a false and misleading color of wrongdoing to transactions honest or entirely unrelated.

In the spring of 1922, there was a change in the relations between the Woodwards and the plaintiff and Susie, who had previously lived as one family. Mrs. Woodward's account of the situation then developed is the clearest and the most credible It is to the effect that Susie was disgruntled at not having employment in the store, and because the Woodwards desired to have their home separate from her and her mother; that she (Susie) proposed to her half-sister that she buy her nineteen shares of stock, par $1,900, for $15,000; that Mrs. Woodward asked her husband's views, and he advised her against the purchase; that nevertheless she made the purchase, paying $12,000 in cash and assuming an overdraft of Susie's from the corporation of about $1,450. This transaction was evidenced by a formal bill of sale dated May 29, 1922, the salient parts of which are as follows:

"Whereas, the said party of the first part [Susie] is the owner and holder of nineteen (19) shares of the capital stock of Gillies & Woodward, Inc., a corporation duly organized and existing under and by virtue of the laws of Porto Rico; and

*      *      *      *      *      *

"First. That for and in consideration of the said sum of twelve thousand dollars ($12,000.00) receipt whereof is acknowledged as aforesaid, the said party of the first part does hereby assign, sell, transfer and set over unto the said party of the second part all of her right, title and interest in and to the nineteen (19) shares of capital stock of Gillies & Woodward, Inc., of which she is now the owner as aforesaid, together with all of her right, title and interest in the said corporation of whatever kind or nature, and does hereby agree in that behalf to execute any and all documents or papers which are necessary or which may be reasonably required.

"Second. That for and in consideration of the agreement herein made, the undersigned Margaret MacKenzie does hereby release and forever discharge the said party of the second part, Jerry D. Woodward, and Gillies & Woodward, Inc., of and from any and all claims, actions, suits or rights whatsoever which she now has or may at any time hereafter have by reason of any cause whatsoever which may have accrued to date and does hereby expressly assign, transfer, and set over unto the said party of the second part, any and all right, title and interest, if any, that she may have in the said corporation Gillies & Woodward, Inc.

"Third. That the said party of the first part for her part does hereby expressly release and forever discharge the said party of the second part, Jerry D. Woodward and Gillies & Woodward, Inc., of and from any and all claims, actions, suits or rights whatsoever which she may now or hereafter have by reason of any cause or causes which may have accrued to date

"In witness whereof, the said parties hereto have hereunto affixed their hand and seal at San Juan, Porto Rico, the date and year hereinabove mentioned.

"Susie C. Gillies.
"Mrs. Margaret MacKenzie.
"Prudence M. Woodward."

This instrument, executed not only by Susie, but by her mother, recites that Susie,

not her mother, is the *owner of the stock,* and contains (undoubtedly out of the excess of caution characteristic of lawyers) a general release from both women, running to both Woodwards and to the corporation.

█ Assuming (contrary to the fact) that plaintiff had then a legal or equitable interest in these nineteen shares, there is no evidence whatever warranting a court in finding this sale invalid. The parties were then dealing at arms' length. Plaintiff and Susie were both competent. They had full opportunity to have a critical examination by lawyers or accountants of the business, if they desired. They knew enough of its condition to seek to obtain nearly $15,000 ($12,000 in cash) for stock, par $1,900—nearly $800 a share. Whether it was in fact then worth more than that is at least uncertain. The finding below that the Woodwards represented the corporation to be insolvent becomes absurd. As noted above, apart from the business capacity of Woodward and his personal relations to tobacco concerns in the states, this business at no time was other than highly speculative and precarious. On this record, it could not be found that this trade was unfair, much less that it was induced by fraud. The $12,000 was deposited in the joint names of plaintiff and her daughter, and presumably taken by plaintiff as her own after Susie's death the next year, 1923. She kept or used it until McNally deposited a like amount in court.

Though unnecessary, we refer to prescription and laches. Rather faintly, appellee's counsel contends that this suit is not to be determined under the Porto Rican Code as to prescription, but under the general principles of equity jurisdiction in the federal courts. Compare Romeu v. Todd, 206 U. S. 358, 27 S. Ct. 724, 51 L. Ed. 1093; Lastra v. N. Y. & P. R. S. S. Co., 2 F.(2d) 812; Diaz v. Gonzalez, 261 U. S. 102, 43 S. Ct. 286, 67 L. Ed. 550. We find it unnecessary to determine that question. Assuming for the moment that it is to be determined under the Porto Rican statutes, we see no escape from the defendants' contention that the action is barred under Civil Code, §§ 1266, 1268, which provide:

"Sec. 1266. The action asking rescission must be brought within four years. For persons subject to guardianship and for absentees, the four years shall not commence until the incapacity of the former has ceased to exist, or the domicile of the latter is known."

"Sec. 1268. The action for nullity shall last four years. This term shall commence to run:

"In cases of intimidation or violence from the day on which it has ceased;

"In those of error or deceit or falsity of consideration, from the date of the consummation of the contracts."

See Jimenez v. Ahumada, 14 P. R. 283; Agostini v. Philippi, 16 P. R. 630.

This transaction was on May 29, 1922. The original complaint was filed June 2, 1927, over 5 years from the last transfer by Susie to Prudence, and over 6½ years after the transfer from Susie to the defendant Jeremiah. The transfers from Susie to Jeremiah and Costas would also fall within the prescription of section 1856, which says:

"The ownership of personal property * * * by uninterrupted possession for six years, without the necessity of any other condition."

█ But even if not barred by the local statute of limitation (prescription) it plainly is barred by laches. The gist of plaintiff's contentions is that she owned the stock standing in Susie's name, and was induced to part with it by fraudulent concealment or misrepresentations of the profits being made in the business, and therefore is entitled to rescind and have back the stock, with all dividends. But the entire record shows that most of these large profits accrued *after* the transfers complained of, and as a result of vital changes in the nature of the business. The decree below awards to plaintiff dividends accruing out of a business radically changed in nature and scope by Woodward after all the transfers now complained of. Under such circumstances, rescission is barred; the applicable remedy for any wrong done was a suit at law for damages, to be assessed with reference to the status existing at the time the wrong was done. Compare Sullivan v. Pierce (C. C. A.) 125 F. 104, 109; Miller v. Rush (C. C. A.) 276 F. 641. Within this period of over five years after Mrs. Woodward's purchase of Susie's nineteen shares of stock, the Woodwards were divorced and adjusted their respective property rights; Woodward (as stated above) had adopted new business methods, with resultant, though still precarious, large profits; their daughter had married McNally, who in 1927 induced his wife's grandmother, then 75 years old, to bring this suit, replete with reckless or groundless charges of fraud.

The bill must be dismissed, with costs in both courts.

The decree of the District Court is vacated, and the cause is remanded to that court, with directions to enter a decree dismissing the bill, with costs; the appellants recover costs of appeal.