**DAVIDSON v. GRADY et al.**
**No. 9101.**

Circuit Court of Appeals, Fifth Circuit.
July 7, 1939.

Rehearing Denied Aug. 17, 1939.

See 106 F.2d 272.

HOLMES, Circuit Judge, dissenting.

Alfred P. Marshall and Cyril E. Pogue, both of Clearwater, Fla., for appellant.

Doyle E. Carlton, Morris E. White, and E. C. Johnson, all of Tampa, Fla., for appellees.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

Brought in 1935 against the surviving husband, individually and as executor of their mother's will, the suit was, by the two surviving children of her first marriage, and the heirs of one child deceased, to rescind and set aside for fraud a family settlement of the estate of their father, made in 1903 and confirmed in 1905. The fraud claimed was, that their mother though in fact remarried, had pretended in the settlement with them, to be, and held herself out as, still a widow, and entitled as such to the interest in the estate which had been willed to her for life or until her remarriage. Stated more in detail, the claim was: that though their mother had secretly married the defendant, and thereby caused the greater part of the property willed to her, to vest in them, and though, by her failure within one year after the probate of the will, to dissent therefrom, she had lost her

right of election to take dower or child's part, in lieu, she fraudulently assumed the guise of, and settled with them, as, a widow, having rights under the will, and the defendant had not only joined with her in the perpetration of the fraud, but had shared with her in the fruits thereof. These fruits, as the bill sets them out, were all of the property she received under the settlement, the money borrowed thereon, and the revenues and returns therefrom, with interest from the time of their receipt.

The prayer was, that defendant account for and be required to pay all sums so received, and convey and transfer back all property acquired by the settlement which he, or her estate, still holds.

Defenses in law to the bill were: (1) That it was defective in not offering to make restitution, by returning the property which their mother took absolutely under the will; (2) that it appears from the face of the bill, that the settlement took into account and disposed of, not only their mother's claim under the will, but her claim to dower and a child's part; (3) that in taking only a child's part by the settlement she did not defraud plaintiffs because she took no more than she would have been in law entitled to, without regard to the will, both under the laws of Missouri where the will was probated, and of Florida where part of the property was situated; (4) that the balance of justice in this case weighs heavily against disturbing the settlement and plaintiffs are prevented by laches from maintaining this suit. For they have not only waited an unconscionable time, far beyond the applicable statute of limitations for relief on the ground of fraud, which in Florida is three years from discovery of the fraud, but for more than thirty years after they knew, or in law were charged with knowledge of the true facts as to their mother's marriage, they have taken no action to disaffirm the settlement, while witnesses have died, and circumstances have changed, until it has become wholly inequitable, if not impossible, to undo, what more than thirty years ago they did, and for more than thirty years have left undisturbed.

For defense in fact, the remarriage in 1902 was admitted. It was denied, that at the time of the settlement, plaintiffs' mother was without interest in their father's estate. It was further denied that, either then or thereafter, she or the defendant had concealed the date of her remarriage for the purpose of defrauding or overreaching her children in the settlement of their father's estate.

In more detail, defendant alleged: that, at the time of the settlement, and as shown by it, his testatrix, instead of being without interest in the estate of her deceased husband, was the owner in her own right, under the will, of interests, bequests, devises and rights, and of an interest in the estate for dower, a year's support, or a child's part in lieu; and that in the agreement of settlement, these rights and claims of hers, were taken into account, and were relinquished by her in exchange for the interest, one-fourth, or a child's part of the estate, which she received by the agreement.

She further alleged: that plaintiffs at the time of the settlement, knew of the remarriage; that in 1904, within one year of the settlement agreement, defendant joined his wife in a deed to one of the plaintiffs; that in 1905, plaintiffs entered into a confirmatory agreement with their mother, expressly and completely ratifying the 1903 settlement, the defendant signing the agreement with her; that thereafter, until 1932, when their mother died, defendant and their mother were living together as husband and wife; that with the knowledge of all, and as to borrowing on the property with the cooperation, of some, of the plaintiffs, she made use of the property she got by the agreement; that during the whole of her life time, no action was taken to set the agreement aside or interfere with her use and possession of the property she had gotten by it, though in law and in fact, plaintiffs knew of the remarriage. It was insisted that to permit them to attack the agreement now, when both the mother and the lawyer who made the settlement for plaintiffs are dead, and a whole life has been lived out on the theory that the settlement was a valid one, would be wholly unjust and inequitable.

At the time of the trial, Mr. Cox, the uncle of one of the plaintiffs, who as the attorney for them all, had negotiated and effected the settlement, was dead. The brother, who was a co-executor with the mother and who in 1913, in defense of a suit his mother had brought against him in Missouri,[1] had alleged that in 1911, he had found out that at the time of the settlement agreement his mother was remarried and the agreement was invalid for

---

[1] Davidson v. Gould, Mo.App., 187 S.W. 591. The claim was rejected as stale.

fraud, was dead. The mother herself was dead. The surviving daughter and her husband, and the surviving husband of the deceased daughter testified for the plaintiffs. Though they testified that they did not actually know the date of their mother's marriage until in 1935, when they saw it as recorded, at Windsor, Ontario, they admitted; that they knew at the time of the settlement, and for some time before had known, that she was and had been living with defendant; and that they then had been suspicious for some time that she was remarried. [2]

Mr. Grady testified that at the time the agreement was made, he knew that Mrs. Gould was living with the defendant. "I didn't know whether she was married or not, but to tell you the truth, I didn't think she was. When the later deeds were executed, Davidson joining her, that was the first time I knew she claimed to be Mrs. Davidson. It came as a great shock to us." "I said, 'At last, we have unearthed it.' Then we commenced to find out when she married Davidson, and I remember her boasting and saying, 'You will never find out'."

Black, the son-in-law, testified that in 1904, he asked both Mr. and Mrs. Davidson when they were married and both refused to tell him, Mr. Davidson saying, "It is none of your business." On cross examination he testified that his question in 1904, was addressed to Mrs. Davidson, and that it was in 1925, when he inquired of and received the answer from Davidson.

The defendant Davidson, testified to his marriage with Mrs. Gould on July 5, 1902, and to his having lived with her continuously thereafter until her death. He denied that either he or Mrs. Davidson had kept the date of their marriage secret for the purpose of defrauding or overreaching plaintiffs. Testifying as to the reason for its being kept secret, and as to why Mrs Davidson for a time afterwards, appeared as Mrs. Gould, he said: "She explained to me that the reason she didn't come out, she didn't want the children to know she had married so soon after Mr. Gould's death. She said, 'Well, I don't know how the children would feel about that. I wouldn't want the children to know I got married so soon'."

As to the charges that he had been active in maintaining the secret, he denied having seen Black at all in 1904, and having had any conversation with him about the marriage in 1925. There was proof that in a suit in 1920, Ed Gould endeavored to have Davidson answer questions as to the marriage date, but they were ruled immaterial to the pending suit. It was undisputed: that Davidson and his wife lived together continuously until her death thirty years after their marriage, the greater part of that time in Paris, France; and that, they buried her father there, and after his death, her mother had lived with them until her death and was buried by them. Nothing in the evidence questions that Davidson was, and remained, a faithful and devoted husband for the thirty years of his marriage.

---

[2] Mrs. Grady, the surviving daughter, testified on cross-examination. "At the first settlement, we suspected that for some time she had remarried, and of course, the estate came to us when she remarried." Q. "Then you suspected at that time that your mother had married previously?" A. "Yes. I don't remember what Mr. Cox reported. I knew that when she acquiesced so readily in the division, something was wrong, because she would not have given up the estate, unless there was some reason." On re-direct examination. Q. "Mrs. Grady, did you mean to testify that when Mr. Cox went up there the first time, you then suspected that your mother had married?" A. "Well, we had been suspicious for some time then. He was very anxious to get some kind of settlement and I am sure we were." And, she testified on direct examination. Q. "If you had known that your mother had really married, would

you have permitted that agreement to be effected?" A. "No, because the will stated that at her death or remarriage, it came direct to we three children." And on re-direct. "If I had known or been strongly persuaded that mother was married, or if I had any suspicions before that, I would not have executed it." She testified further on direct. "I don't know the date when my mother died. There had been no intercourse between us at all. After these dealings under which the estate was settled up, my brother and I felt the same. We were both bitter. We felt that we had been deceived and to put it plainly, almost robbed." Q. "Did you keep up with your mother or she with you?" A. "No. I didn't hear a word from her and she didn't hear from me. We felt that she had not only deceived us, but that she was not carrying out our father's wishes."

The District Judge rejecting the defense of laches, entertained the bill. Finding, as he was bound to do, that at the time of the agreement, Mrs. Gould had remarried, thereby greatly changing her interest in the estate under the will; that it was a fraud for her to appear as a widow, when in fact she had remarried, and to deal with her children without a full statement of all the facts; he found that the settlement was effected with fraud, and should be set aside, and he gave a decree for plaintiffs, in accordance with their prayer.

Appellant is here insisting that the decree is wanting in equity; because, notwithstanding their long and unconscionable delay in suing, with the death of witnesses and the chain of circumstances following in the train of the delay, it has sanctioned the pressing of a claim long stale, has upset a family settlement on the basis and faith of which, a whole series of loyalties and obligations have been assumed and discharged, and whole lives have been lived out, and after the mother's death, has burdened him with an accounting as to dispositions of property made, and moneys spent by her, in reliance on the fact that the transaction was a closed one, and would not and could not be reopened. Insisting, in short, that a clearer case for the application of laches could not be imagined, he urges upon us that the demand is stale, the settlement ought not now, at this late date, to be inquired into, and the decree sustaining the attack upon it, and calling him to account, ought not to stand.

We agree with appellant. Laches, unlike limitations, is not a defense which depends alone upon the running of time. It is a defense against stale demands, which appealing to the conscience of the Chancellor, invokes his soundest and wariest discretion, to prevent the prosecution of claims gone stale, that is, claims which, if they existed, should have been put in litigation many years before. It bases in a public policy which for the peace of society, discourages stale demands. Under its influence, the courts withhold relief where it would be inequitable to grant the demands. Creswill v. Grand Lodge Knights of Pythias of Georgia, 225 U.S. 246, 32 S.Ct. 822, 56 L.Ed. 1074; O'Brien v. Wheelock, 184 U.S. 450, 22 S.Ct. 354, 46 L.Ed. 636. Negligence is or may be laches, diligence is its opposite. Thus, it is said that laches is negligence, or an omission seasonably to assert a right. Denver & Rio Grande Railroad Co. v. Arizona & Colorado Railroad Co. of New Mexico, 233 U.S. 601, 34 S.Ct. 691, 58 L.Ed. 1111; Edwin A. McIntire v. Mary C. Pryor, 173 U.S. 38, 19 S.Ct. 352, 43 L.Ed. 606. Thus, a Federal court sitting in equity, though not bound by state statutes of limitations, will be guided thereby, in determining whether because of laches, a suit should be dismissed, Benedict v. City of New York, 250 U.S. 321, 39 S.Ct. 476, 63 L.Ed. 1005, and when, as here, the delay is far beyond that fixed by an applicable statute of limitation, by so much the more will the defense of laches be sustained.

We do not understand that appellees at all dispute these general principles. Their point is, that neither limitations nor laches runs until full and complete discovery of fraud, and that though, for many years, they suspected the existence of a fraud, they did not discover evidence by which they could prove it, and therefore did not make full discovery until 1935. We do not think this will do. For, as settled as is the rule, that if plaintiff did not know of the facts giving rise to the cause of action, he cannot be charged with laches, United States v. Beebe, 180 U.S. 343, 21 S.Ct. 371, 45 L.Ed. 563, is its corollary that there is knowledge or notice of a fraud if there is reasonable opportunity to acquire knowledge, Wetzel v. Minnesota, 169 U.S. 237, 18 S.Ct. 307, 42 L.Ed. 730. One, in short, will be charged with knowledge, where the evidence leads to the conclusion that he could have informed himself of the facts by the degree of diligence which the law required, Charles Foster v. Mansfield, Coldwater & Lake Michigan Railroad Co., 146 U.S. 88, 13 S.Ct. 28, 36 L.Ed. 899, where the circumstances of which he was cognizant were such as to put a man of ordinary prudence on inquiry. Halstead v. Grinnan, 152 U.S. 412, 14 S.Ct. 641, 38 L.Ed. 495; Felix v. Patrick, 145 U.S. 317, 12 S.Ct. 862, 36 L.Ed. 719. We think it would be difficult to find in the books, a more egregious case of laches, a claim more clearly demanding its rejection as a stale demand.

Here, the mother and all of the children except one, parties to a family settlement are dead. The lawyer who arranged and carried it out for the plaintiffs, the mother being unrepresented, is dead. For more than thirty years, no action has been taken to rescind or invalidate the settlement agreement, and the subsequent ratification

of it, though for more than that time, the children have known of the fact of her remarriage, and if they did not actually know, were charged with knowledge, because they were in a position to learn by the exercise of the slightest diligence, what they suspected and believed, that its date was prior to the settlement.

In their amended pleading, plaintiff specifically states, that Ed Gould, Mrs. Grady and Mrs. Black, all knew in August, 1905, of the marriage, had inquired of Mrs. Gould when it was, and she had declined to tell them. They knew the importance of that date. Mrs. Gould did not again mislead them, nor even lull them, but took a defiant attitude. They nevertheless, instead of refusing to go further until the matter was cleared up, elected to go ahead anyhow, and signed a paper which expressly ratifies that of 1903. They then waited thirty years, during all of which time, the atmosphere of strife continued, knowing that the date of marriage was withheld, and what its bearing was, and also knowing that both Mr. and Mrs. Davidson could at any time, be forced to disclose it, by either filing a proceeding in the probate court to reopen the settlement, or by filing a bill as was finally done. In either case Mrs. Davidson could have been required to discover, and Davidson could have been required to testify. They, therefore, at all times had a perfectly plain path to ascertain the exact truth and enforce their rights.

We may concede, that if the suit had been timely brought, with the witnesses all living, so that the facts could be fully developed, and it had appeared that at the time of the settlement, the mother by her remarriage and failure to timely elect a child's part, was at the mercy of her children, the Chancellor would have had to say to her: "by your remarriage you lost most of the property the will gave you; by your failure to elect, you have lost your statutory rights. You are, except for the portion the will gave you unconditionally, at the mercy of your children, and because you have deceived them in the agreement, I cannot, on considerations of their filial obligation to you, refuse to set it aside, if they will restore to you that part of the property the will gave you without condition. But when as here, thirty-two years after the settlement, thirty after its ratification, with the crucial witnesses dead, and the true facts impossible of as-

certainment, the cry of fraud is raised against their mother's executor, the Chancellor conceding as he must, that there was fraud in the pretense, that their mother was a widow, when in fact she had remarried, would not be greatly activated on this record to move at the children's cry, 'Mother having remarried, and sleeping upon her rights, having failed timely to elect a child's part, defrauded us more than thirty years ago, by obtaining from us by settlement, the child's part she would have been entitled to on a timely election'." On the contrary, when at this late date, offering to give nothing, allow nothing, restore nothing, and without explanation of their long sleeping on their rights, if they had any, they demand that the agreement be nullified, and the executor be made to account for everything their mother got and spent, the Chancellor would have to say, "I may not do so. I see that the will gave your mother considerably more than she got in the settlement. I see that it was at your insistence, through your lawyer, Mr. Cox, that the settlement was made. I see too, that you and Mr. Cox knew at the time the settlement was made that your mother, if not married to, was living with Mr. Davidson, and I see by your testimony that you then strongly suspected that your mother was married to him, or that something was not right. At least, one of you says, 'I suspected something was wrong, or mother would not have signed the settlement.' You thus admit that you then knew you were getting something by the settlement, that you were not entitled to unless something was wrong with your mother's status. I see by the agreement that as consideration for the settlement you made with her, you acquired not only her rights under the will, but specifically all her rights of dowry, life estate, and child's part. Thus, I see from the instrument of settlement and from your evidence, that whatever in fact your mother's rights were, when you made the settlement, your lawyer took into consideration and settled every right she had or claimed to have, both under the will and against it. Nor do I find anything in the evidence to indicate that at the time of the settlement it was claimed or understood that her rights to dower, life estate, or child's part, had then been lost by her failure to elect. On the contrary, the settlement took all of these rights and claims into consideration, and they all fell into and weighed down the balance. Seeing that this is so, and hear-

**410**

ing from your lips that you thought even then that she perhaps was married, you knowing that she was living with Davidson, and considering as I must, that the mouth of Cox, the lawyer, is closed, as is the mouth of your mother and brother, who, as one of the executors was responsible for the handling of the estate, I can but conclude, that at the time of the settlement, all of the rights and claims of your mother were known, recognized, considered, and taken into account. Perhaps, indeed, there was evidence then existing, that she had duly and timely made her election not to take under the will. Now, thirty-five years after, the real makers of the settlement, your mother for herself, and your lawyer and agent for you, dead, so that I cannot know what the facts are as to the real position your mother stood in then, and the real basis on which she made the settlement, I cannot, acting intelligently or justly, entertain your claim. Especially can I not do so, when it appears both from your pleading and your evidence, that within one year from the time of the settlement, you knew that your mother had been for some time remarried, for she signed a deed then as Mrs. Davidson, and in 1905, after another year, you made a new settlement agreement with her as Mrs. Davidson, fully confirming the settlement you had made two years before. You did this too, though your testimony shows that you strongly suspected, if you did not know, that she had remarried before the agreement, because you were as you say 'from the time of the settlement, bitter toward her and you felt you had been robbed.' More, you then asked her when she was married and she told you, 'You will never find out,' and notwithstanding this, and that you knew she was concealing the time of her marriage from you, you went on with the new ratification agreement fully confirming and ratifying what you had done before. Finally, though, you testify that from the moment she made the settlement and because she made it, you suspected that she had already remarried, and Ed Gould in 1913 pleaded under oath that she was remarried at the time of the settlement, during her whole life, thereafter, you did nothing to undo the settlement and restore the status quo. Your claim is stale. Your laches barred it long ago."

Many authorities may be cited to sustain these views. There is an excellent, though brief treatment of the whole subject in 19 A.M.Jur.Sec. 489-515. In addition to the cases already referred to, and Scheftel v. Hays, 8 Cir., 58 F. 457; Foster v. Mansfield, C. & L. M. R. Co., 146 U.S. 88, 13 S.Ct. 28, 36 L.Ed. 899; Williams v. Williams, 7 Cir., 61 F.2d 257; Miller v. Rush, 5 Cir., 276 F. 641, attention is called to two recent decisions of the court, Holman v. Gulf Refining Co., 5 Cir., 76 F.2d 94; Brite v. W. J. Howey Co., 5 Cir., 81 F.2d 840, in which the rule which controls the case is stated with clearness and precision, and as clearly and precisely applied.

The decree is reversed and the cause is remanded with directions to dismiss the bill.

HOLMES, Circuit Judge (dissenting).

On October 21, 1901, David Gould died testate in St. Louis, Missouri, leaving a large estate in Florida, Missouri, and Wisconsin. Surviving him were his widow, Emma E. Gould; one son, Edward M. Gould; a married daughter, Mrs. Henry W. Grady; and an unmarried daughter, Emma, who, on July 8, 1902, was married at the home of her sister in Atlanta, Georgia. Certain provisions were made for the widow by will probated on December 29, 1901, and much property was devised and bequeathed to her so long as she lived and remained unmarried. Upon her death or re-marriage, it was provided that all such property should vest in fee simple in the three children of the widow and testator in equal shares. As nominated in a codicil, the widow and son qualified as the executrix and executor without bond.

On July 5, 1902, the widow, 50, and appellant, 29, whom she had met in a department store in Chicago, were secretly married in Windsor, Canada. She went alone from the altar of her secret wedding to the marriage, three days later, of her daughter in Atlanta, where, dressed in mourning, she was presented as Mrs. Gould, and gave no hint of having been re-married. She left immediately after the ceremony for her home in Chicago, continued to collect revenue on property which, upon her re-marriage, had passed to her children under the will, and had no communication with them until July, 1903, almost twenty months after the will had been probated, when, still posing as unmarried, she negotiated a contract of settlement by which the property belonging to them was divided so as to give her and each of the children a child's part. Though she had been married for more than a year, the supposed widow

described herself in the deeds as Emma E. Gould, and represented over her own signature that she was the widow, and unmarried, of David Gould. This was the very crest of fraud, which, aided by appellant, was successfully concealed during the remainder of her life.

In March, 1904, the two daughters saw their mother for the first and last time after Emma's marriage in Atlanta. Accompanied by her husband, the mother met her daughters by chance in Clearwater, Florida. Some questions were naturally asked as to when they were married, and Mrs. Davidson informed them that this they would never find out; Mr. Davidson also refused to tell. This aroused the suspicion of the children, and caused them to make diligent search, over a long period of years, to ascertain the date of their mother's remarriage.

August 23, 1905, a supplemental agreement was made with reference to certain assets not particularly provided for in the contract of July 24, 1903. The children knew that their mother was married at this time, but did not know, and had been unable to learn, when or where the marriage was solemnized. This secret was still intact, suspicion remained baffled, and diligence defeated. The execution of this agreement was but another step in the fraudulent design to procure an interest in property which she well knew had already become vested in her children without their knowledge. Thereafter, communication ceased between the mother and children; she wrote no letters; lived in Chicago, Lorain, Ohio, and Clearwater, Florida; never returned to Missouri or Wisconsin to reside; and never informed the children as to her movements or location. When she died, years afterwards, the appellant did not inform the surviving daughter or any of appellees, and they did not know of her death until months afterwards.

About 1910, the mother and Mr. Davidson went to Paris, France, and lived there until she died in 1932. The mother never came back to this country, even on a visit; but Mr. Davidson returned on several occasions. He was a witness in some litigation in Florida in 1920, when he again refused to tell when and where he was married. This was in a suit brought by Mrs. Davidson and her husband to quiet title to certain real property in Florida. How persistently this fraud was being concealed, how diligently the children were seeking

to learn the truth, and how fully the appellant was aiding and assisting in the perpetration thereof is illustrated by what took place in this litigation. Edward M. Gould employed an attorney to require appellant to answer an interrogatory as to when and where he was married; but the courts of Florida held the question to be immaterial, and that he was not compelled to answer it. The unavailing search continued throughout the United States, but no inquiry was made with reference to Windsor, Canada, a place where the mother had never lived or visited, so far as the children knew. All of their efforts failed until after Mrs. Davidson's death, when a federal agent in auditing her taxes gave the clue. Promptly upon the discovery of the crucial date, this suit was brought to cancel the contracts of settlement because of the concealed fraud, and for an accounting.

It is argued that, within one year from the date of its probate, the widow might have dissented from the will and elected to take either dower or a child's part; but the court below found, upon undisputed evidence, that she did not so dissent, and that she had long ceased to have any right to the property in controversy on July 24, 1903, when she entered into an agreement with her children for a division of the estate, falsely pretending not to have been re-married. This court is without power now to make the election for her or to roll time backward to permit her executor to do it. If she had exercised her right of election, which is personal to the widow, who can say that she would not have taken dower?

Because the children did not sue their mother upon suspicion, because they acted and continued to act, until they had proof to the contrary, upon the presumption that they had been told the truth by their mother, and the executrix of their father's will,—the doctrine of laches, rejected below, is urged here as a defense. Laches even within the term of the statute of limitations is a defense in equity, but fraud withers everything it touches, and it is idle to talk of laches where the fraud is surpassing, and so well concealed that even the statute of limitations would be tolled if this were an action at law.

Fishing bills in equity are not allowed, and there was no lack of due diligence in not filing suit against this mother, and executrix, to require her to discover a fact

which she had solemnly affirmed did not exist, and to prove which the children and beneficiaries were unable to produce the slightest evidence. Before 1910, Mrs. Davidson had ceased to reside in the state of her appointment as executrix, had left her former home in Wisconsin, and with her husband had established residences in three other states, prior to embarking for France. After 1910, she was beyond the jurisdiction of every court in the United States. She was not personally subject to compulsory process, either as a witness or as a defendant. She did not come home to the funeral of her father; appellant came, but he could not be sued for her fraud while she was alive. Statutes of limitation do not run in favor of defendants beyond the jurisdiction of the court, and the defense of laches falls with the defense of the statute of limitations.

A cause of action cannot be barred by laches before it accrues; it is never extinct when it comes into existence. In Florida, an action for relief on the ground of fraud is not "deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." Sec. 4663, par. 5, Florida Statutes. The forum of this litigation is in Florida, the controversy is over real estate in Florida, and we are bound by the laws of that state; but, without regard to when the cause of action accrued, relief is asked in this case on the ground of fraud, and time did not begin to run until the fraud was discovered or with reasonable diligence should have been discovered. The fraud consisted in concealing the fact of marriage until after the settlement of July 24, 1903. The subsequent discovery of the marriage relation in March, 1904, did not reveal the date of its inception, and the fraud from then until 1935 consisted in concealing the fact that the marriage relation began prior to the settlement of July 24, 1903. The children had the right to presume that it took place after that settlement; it was their duty to presume that they had not been defrauded, and to carry out the contract, until by due diligence they discovered or should have discovered the fraud. The date of the secret wedding was material to the extent of being decisive of the title to the property involved in this litigation. If it occurred after July 24, 1903, the settlement was binding and had to be carried out; if before that date, it was voidable. Upon the death or re-marriage of the widow, the title to valuable property passed to the children under the will, which is the common source of title. The date of the marriage was as material as the date of the death of the widow would have been, if it had occurred before July 24, 1903, and had been kept secret by appellant.

That Edward Gould would have spent money to ascertain something already within his knowledge is incredible. His diligence in trying to find out what his mother said they would never find out convinces me that he did not know the time and place of the secret marriage until 1935. All of the transactions relied on by appellant to effect a ratification of the settlement of July 24, 1903, are but steps in continuation of the original fraudulent contract. Full knowledge of material facts is essential to the ratification of a voidable transaction. Appellant cannot complain that the children did not know, because he is one of those who refused to tell. Equity should not lend its aid to enable one who abetted in the perpetration of a fraud to retain the fruits thereof.

Finally, the burden of proving concealed fraud in this case is on appellees; they have done it. The burden of proving laches is on appellant; he has failed to do it. A strange kind of laches is attributed to the children; neglect to ascertain a fact which the mother knew and refused to tell. Suspicion is not knowledge,[1] and due diligence required them only to ask her the question, the answer to which was peculiarly within her knowledge, and to which she was under a double duty to reply. It is said that the defense of laches appeals to the conscience of the chancellor, invokes his soundest and wariest discretion. If this be true, we should respect the exercise of that discretion in this case. The trial court heard the witnesses and made very full findings of fact. I concur therein in all respects, likewise in its conclusions of law, and, therefore, must dissent from the reversal of the decree under review.

---

[1] Marbourg v. McCormick, 23 Kan. 38; Michoud v. Girod, 4 How. 503, text 560, 11 L.Ed. 1076.